UNITED   STATES   DISTRICT   COURT
SOUTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

      -v-

CHRISTOPHER PENCE,

             Defendant.

_____


**MEMORANDUM  OF LAW
IN SUPPORT OF CHRISTOPHER PENCE'S PRE-TRIAL MOTION**


SCHILLINGER & ASSOCIATES, PLLC
Eric K. Schillinger, Esq.
Bar Roll.: 516083
*Attorney for Defendant Christopher Pence*
11 North Pearly Street, Suite 1700
Albany, New York 12207
(518) 595-9529
eric@schillinger-law.com

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES      ii

SUMMARY      1

STATEMENT OF FACTS      2

LEGAL ANALYSIS      9

    I.  *Miranda* Violations Require the Suppression Of All Statements Allegedly
Made By Mr. Pence      9

    A.  Standards  Applicable to A Fifth Amendment *Miranda* Analysis.      9

    B.  Statements Made in Response to Unwarned Custodial Interrogation Must
Be Suppressed.      10

    C.  The Defendant's Statements Were Clearly the Product Of Intentional
Custodial Interrogation by FBI Agent DeCarr.      16

    II.  Mr. Pence Was Subjected to An Illegal, Two-Step Interrogation Technique
Undermining the Defendant's *Miranda* Rights and Requiring Suppression
of the Entirety of The Defendant's Statement.      18

    III. No Exception To The Requirements of *Miranda* Applies Here.      23

    IV. An Evidentiary Hearing is Required.      25

CONCLUSION      25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)                                          10

*California v. Beheler*, 463 U.S. 1121, 1125 (1983)                                       10, 11

*Colorado v. Connelly*, 479 U.S. 157, 168 (1986)                                         10

*Culombe v. Connecticut*, 367 U.S. 568, 581 (1961)                                       9

*Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972)              10

*Miller v. Fenton,* 474 US 104, 113 (1985)                                               11

*Miranda v. Arizona*, 384 U.S. 436 (1966)                                                2, 9

*Missouri v. Seibert*, 542 U.S. 600, 609 (2004)                                          18, 19, 20, 21

*New York v. Quarles*, 467 U.S. 649, 655 (1984)                                          11, 23

*Orozco v. Texas*, 394 U.S. 324, 326-327 (1969)                                          11

*Rhode Island v. Innis¸* 446 U.S. 291, 297 (1980)                                        10, 16, 17

*Thompson v. Keohane*, 516 US 99, 112-113 (1995)                                         11

*United States v. Ahmad,* 992 F. Supp. 682, 685 (S.D.N.Y. 1998).                         25

*United States v. Beraun-Panez*, 812 F.2d 578, 582                                       12

*United States v. Bingivenga*, 845 F.2d 593, 596 (5th Cir. 1988)                         11

*United States v. Capers*, 627 F.3d 470, 477-479 (2nd Cir. 2010)                         10, 12, 21, 22

*United States. v. Carter,* 489 F.3d 528, 536 (2nd Cir. 2007)                            22

*United States v. Cohen*, 372 F. Supp. 2d 340, 355 (E.D.N.Y. 2005)                       19

*United States v. Craighead*, 539 F3d 1073, 1084 (9th Cir 2008)                          11, 12

*United States v. Culotta,* 413 F.2d 1343, 1345 (2d Cir. 1969)                           25

*United States v. Estrada*, 430 F.3d 606, 612 (2nd Cir. 2005)                            23

*United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993)                    11, 12

*United States v. Guarino*, 629 F. Supp 320, 324-325 (Dist of Conn., 1986)        11, 13

*United States v. Howard*, 115 F.3d 1151, 1153 (4th Cir. 1997)                    12

*United States v. LaPierre,* 998 F.2d 1490, 1466 (9th Cir. 1993)                  17

*United States v. Lee*, 699 F.2d 466, 467 (1982)                                  11, 12, 13, 15

*United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007)                  11, 12

*United States v. Planche*, 525 F.2d 899, 900 (5th Cir. 1976)                     11

*United states v. Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007)                   12

*United States  v. Rumble*, 714 F.Supp 2d 388, 391-392 (NDNY 2010)               24

*United States v. Street*, 472 F3d 1298, 1314 (11th Cir. 2006)                    21

*United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006)                  21, 22

## TABLE OF STATUTES

18 U.S.C. Section 1958(a)                                                         1, 2

U.S. Constitution Amendment V                                                     9

Schillinger, & Associates, PLLC, Eric K. Schillinger, Esq, of counsel, represent the accused, Christopher Pence.

## SUMMARY

Defendant Christopher Pence has been indicted on one count of Use of a Facility of Interstate Commerce in Connection with Murder for Hire in violation of 18 U.S.C. Section 1958(a) [*see* 1:21CR-393 TJM ECF Doc. 4]. Mr. Pence submits this memorandum of law in support of his motion to suppress statements and physical evidence obtained illegally after his arrest at his home in Utah on October 27, 2021 [*see generally "*Affidavit of Defendant Christopher Pence in Support of his Pre-Trial motions to Suppress Statements and Evidence", attached here as **Exhibit "A"**]. On that date and time, nearly two-dozen heavily armed F.B.I. agents and additional law enforcement agencies' officers, stormed Mr. Pence's home to execute a search warrant related to the instant charges [**Exhibit "A"** at p. 1, *see also* "F.B.I. Report 166c-AL-3491673 Serial 14" attached here as **Exhibit "B"**]. During the execution of that warrant, Mr. Pence was separated from his family and placed in an F.B.I. vehicle, where he was interrogated about his role in an alleged murder-for-hire plot for more than five hours, in an illegal two-step interrogation process [*see* **Exhibit "A"** at p. 3-4].

Mr. Pence was not provided *Miranda* warnings until after he gave a complete confession, more than two-hours after his interrogation began [**Exhibit "A"** at p. 4, *see also* Recording of Mr. Pence's Interrogation, attached here as **Exhibit "C"** at 2:11:40, *see also* F.B.I. Drafted Transcript of Interrogation Recording attached here as **Exhibit "D"**[1] at p. 147]. After finally *Mirandizing* Mr.

---

[1] The Government has provided to defense counsel a transcript of the recording of Mr. Pence's interrogation by Agent DeCarr.  Review of both exhibits indicates the transcript is a generally accurate transcription of the interrogation, and both are attached here for the Court's convenience. Should the Court find that differences between the two exhibits exist the defense would request the Court consider the audio recording of the interrogation to be the controlling document rather than the transcript created from the audio recording.

Pence, Agent DeCarr revisited his immediate prior questioning with no break in time or change in location, asking Mr. Pence to confirm much of what he had stated to the agents prior to being *Mirandized*. [**Exhibit "A"** at p. 4-5] Mr. Pence was then taken into police custody and transported to jail.

The warnings that were administered in the middle of the interrogation were ineffective. The unwarned interrogations violated Mr. Pence' rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the Fifth Amendment to the United States Constitution. Mr. Pence' unwarned statements, and any information obtained through those unwarned statements must be suppressed.

Moreover, Mr. Pence' putative waiver in the middle of the two interrogations was involuntary, and for this additional reason, statements thereafter made must be suppressed. In sum, all statements made by Mr. Pence pursuant to custodial interrogation must be suppressed.

## STATEMENT OF FACTS

Defendant Christopher Pence resided at 2929 South 6500 West Cedar City Utah on October 27, 2021, with his wife Michelle, thirteen of his children, and his parents Shannon and Robyn Pence [**Exhibit "A"** at p. 1]. On that date, almost two dozen F.B.I. agents in addition to other agencies' agents, stormed Mr. Pence's home to execute a search warrant regarding an investigation into Use of a Facility of Interstate Commerce in Connection with Murder for Hire in violation of 18 U.S.C. Section 1958(a) [**Exhibit "A"** at p. 1 see also **Exhibit "B"**].  The agents entered Mr. Pence's home dressed in full riot gear [**Exhibit "A"** at p. 1].  Most of the agents carried AR-15 style assault weapons [**Exhibit "A"** at p. 1].  Mr. Pence and ten of his children were in the downstairs of the home [**Exhibit "A"** at p. 1].  His wife, other children and his parents were upstairs [**Exhibit "A"** at p. 1].  His wife, children and parents were not allowed to look out of the windows [**Exhibit "A"** at p. 1-2].  Agents patted Mr. Pence down for weapons, then instructed

him to have the other adults in the home come downstairs [**Exhibit "A"** at p. 1].  When Mr. Pence started up the stairs to get them, he was stopped, told he could not go upstairs and was required to yell upstairs to his family to get them [**Exhibit "A"** at p. 1-2].  His wife, his parents, and one child came downstairs at that point, which only left his one -year-old infant and his four-year-old son still sleeping upstairs [**Exhibit "A"** at p. 2].  Once his wife was downstairs, the armed agents asked her if everyone was now downstairs, to which she replied that two children were not downstairs yet [**Exhibit "A"** at p. 2]. While escorted by two armed agents, Mrs. Pence was allowed to retrieve their one-year-old son from their bedroom, but she was not allowed to retrieve their four-year-old child, or to even be present while the armed agents retrieved the four-year-old [**Exhibit "A"** at p. 2].  Instead, two fully armed agents in full riot gear went upstairs and retrieved their four-year-old son and brought him downstairs [**Exhibit "A"** at p. 2].  When the agents finally brought their four-year-old son downstairs, he was visibly shaking, and asked his family if "those two men were going to kill him." [**Exhibit "A"** at p. 2].

The number of law enforcement at the scene was overwhelming.  Mr. Pence could see agents guarding every visible staircase, his living room, and his front door [**Exhibit "A"** at p. 2]. The agents told his children to go into the family room, out of his sight, and did not permit Mr. Pence to accompany them, instead a dozen or so fully armed agents accompanied the children [**Exhibit "A"** at p. 2].  This transpired prior to Mrs. Pence even making it downstairs to be with their children [**Exhibit "A"** at p. 2].  Outside through the windows he could see armed agents guarding each of his vehicles as well [**Exhibit "A"** at p. 2]. Agents carried an assault rifle and wore body armor [**Exhibit "A"** at p. 1].



*Figure 1: Image from www.F.B.I..gov/investigate/how-we-investigate.* [2]

After agents patted down Mr. Pence, he was told to come outside to speak with agents [**Exhibit "A"** at p. 2].   Mr. Pence was not wearing shoes [**Exhibit "A"** at p. 2].   He told the agents he had to get his shoes from upstairs [**Exhibit "A"** at p. 2].   Again, they refused to allow him to move freely in his own home, and instead an agent with an AR-15 followed Mr. Pence upstairs [**Exhibit "A"** at p. 2].  The agent told Mr. Pence to move slowly and that if he made any quick movements then he would be shot [**Exhibit "A"** at p. 2].

After Mr. Pence and the agent retrieved his shoes, he was brought outside for questioning [**Exhibit "A"** at p. 2]. When Mr. Pence walked out of his front door, he could see many unmarked Chevrolet Tahoe SUVs and other police cars, all with emergency lights flashing in his driveway. [**Exhibit "A"** at p. 2-3]. The law enforcement vehicles were parked in such a fashion as to completely block Mr. Pence's driveway, making it clear no vehicle was driving in or out of the house. [**Exhibit "A"** at p. 2-3].

---

[2] Images used for illustrative purposes, not actual images of Mr. Pence's arrest.



*Figure 2 Example of F.B.I. Style Chevrolet Tahoe in which Mr. Pence was held for over five hours.*
*https://arstechnica.com/cars/2017/07/why-did-chevy-bring-its-tahoe-and-us-to-a-firing-range/*

Mr. Pence was taken to one of the F.B.I. Tahoes and placed in the rear seat [**Exhibit "A"** at p. 3-4]. Mrs. Pence, their children, and his parents were not allowed to look out of any of the windows [**Exhibit "A"** at p. 3-4]. From where Mr. Pence was sitting in the Tahoe, he never once saw his family come to check on him through the living room windows [**Exhibit "A"** at p. 3-4]. Two agents – Agent Brian DeCarr and Agent Chris Anderson joined Mr. Pence in the vehicle [**Exhibit "A"** at p. 3, **Exhibit "D"** at p. 1]. Agent Anderson sat directly behind Mr. Pence in the third row of the SUV [**Exhibit "A"** at p. 3, **Exhibit "D"** at p. 2]. Agent DeCarr sat directly next to Mr. Pence in the second row of the SUV, on his right side [**Exhibit "A"** at p. 3, **Exhibit "D"** at p. 2]. Due to Mr. Pence's seating position in the vehicle, while looking at Agent DeCarr, he had clear view of his home and could continuously see agents storming his home, the fully armed agent in riot gear standing in the living room between him and his family, and the armed agents with AR-15's constantly walking between the front door of the home and the vehicles, where he was [**Exhibit "A"** at p. 3-4].

Agent DeCarr and Agent Anderson were dressed in riot gear [**Exhibit "A"** at p. 3-4]. They made a point to remove said gear when they got in the car with Mr. Pence [**Exhibit "A"** at p. 3-4, **Exhibit "D"** at p. 2]. One of the agents removed his gear and displayed it on the front seat of the vehicle [**Exhibit "A"** at p. 3-4, **Exhibit "D"** at p. 3]. Agent Anderson's service handgun was still clearly visible on his right hip to Mr. Pence once the agent removed his riot gear [**Exhibit "A"** at p. 3-4, **Exhibit "D"** at p. 3].

Agent DeCarr did not provide a *Miranda* warning to Mr. Pence at the outset of the interrogation. Instead, after placing Mr. Pence in the F.B.I. SUV, Agent DeCarr told Mr. Pence:

> You are not under arrest, at all. That's not what we're doing. We're just here to talk. You're under no obligation to talk to us, we- we would appreciate your help, okay? In- in just trying to figure out- 'cause obviously we're here for a reason, right? So, we're just trying to figure- figure out- … [**Exhibit "D"** at p. 3].

Agent DeCarr did not tell Mr. Pence he was free to leave [**Exhibit "A"** at p. 3-4, **Exhibit "D"** at p. 3]. Instead he told Mr. Pence that he had traveled to his home in Utah for help just figuring something out [**Exhibit "A"** at p. 3-4, **Exhibit "D"** at p. 3]. This was boldfaced deception by the agent in an effort to make Mr. Pence admit his involvement in the case Agent DeCarr was investigating and nothing more. Agent DeCarr was the lead agent in a case investigating Mr. Pence for two months prior to the agent's traveling from New York to Utah on the day of Mr. Pence's arrest and interrogation [*see* F.B.I. Report 166C-AL-3461673 Serial 1 attached here as **Exhibit "E"**). In that time Agent DeCarr sought aerial surveillance of Mr. Pence's home and sought permission to use an undercover F.B.I. Agent posing as a hitman to contact Mr. Pence for investigative purposes [*see* F.B.I. Report 166C-AL-3461673 serial 5 attached here as **Exhibit "F"**]. Agent DeCarr's incredulous claim that Mr. Pence was "not under arrest at all" was made while he held Mr. Pence in an F.B.I. Tahoe, isolated from his family, while his home was filled with agents in riot gear pointing assault weapons at his wife, children, and parents [**Exhibit "A"**

at p. 3-4].   Agent DeCarr was not on a fact-finding adventure with no suspicion when he traveled to Utah to arrest Mr. Pence, his own reports make clear he went there with the belief that Mr. Pence was involved in the alleged plot and intended to bring charges against him [**Exhibit "F"** at p. 2]. Agent DeCarr chose to illegally interrogate Mr. Pence without providing a pre-interrogation *Miranda* Warning after taking Mr. Pence into custody, expressly to deter Mr. Pence from remaining silent, in direct violation of the rule in *Miranda*, so he could obtain the arrest he sought [**Exhibit "A"** at p. 4-5, **Exhibit "D"** at p. 3].

While Mr. Pence was held in the F.B.I. Tahoe, multiple agents sporting assault weapons stood outside the vehicle in Mr. Pence's plain view [**Exhibit "A"** at p. 4]. From the back seat of the vehicle, Mr. Pence could see agents wielding assault weapons in his home with his family [**Exhibit "A"** at p. 4].  He could see agents all around the vehicle he was in, wielding assault weapons [**Exhibit "A"** at p. 4].  The agents he was with in the vehicle were armed [**Exhibit "A"** at p. 4].  His driveway was blocked by multiple police vehicles, all of which had their emergency lights on [**Exhibit "A"** at p. 4].  Mr. Pence was not told he was free to leave (he had been told if he made any fast moves he would be shot) and was not *Mirandized* at the start of his interrogation [**Exhibit "A"** at p. 2-4].

What followed was a classic two-step interrogation process [**Exhibit "A"** at p. 4-5]. Mr. Pence was interrogated for over five hours [**Exhibit "A"** at p. 4-5, *see generally* **Exhibit "C"** and Exhibit **"D"**]. He was asked detailed questions about an alleged murder-for-hire plot [**Exhibit "A"** at p. 4, *see generally* **Exhibit "D"** at p. 3-147]. Agent DeCarr employed basic interrogation tactics, intentionally misleading Mr. Pence and telling him the agents were only there to try to "figure things out." [**Exhibit "D"** at p. 3].  Mr. Pence was told the F.B.I. had taken over a murder-for-hire website [**Exhibit "A"** at p. 4, **Exhibit "D"** at p. 113]. He was told F.B.I. investigation uncovered

communications on that website which pointed to Mr. Pence's IP address [**Exhibit "D"** at p. 114-115]. Mr. Pence was then asked to explain his involvement in the murder-for-hire website [**Exhibit "D"** at p. 117]. Mr. Pence was not *Mirandized* before being asked these questions [**Exhibit "D"** prior to p. 147].

What followed was more than two hours of questioning of Mr. Pence by Agent DeCarr, while Mr. Pence was held in the back of the F.B.I. vehicle watching other agents brandish assault weapons at his family and throughout his property [**Exhibit "A"** at p. 3-4]. Practically speaking, with law enforcement dominating his entire home and blocking any possible route of egress even if Mr. Pence had not been held inside an F.B.I. vehicle during the interrogation, there was no reasonable way for any person in his shoes to end the custodial situation voluntarily [**Exhibit "A"** at p. 3-5]. Mr. Pence could not leave and go home to get away from agents because his home was full of agents in riot gear with assault weapons [**Exhibit "A"**]. Similarly, Mr. Pence could not leave his location, even if he was allowed out of the F.B.I. vehicle, because his driveway was barricaded by law enforcement vehicles and his personal vehicles were guarded by agents with assault weapons [**Exhibit "D"** at p. 2-3].

After Mr. Pence answered all of Agent DeCarr's questions for over two hours and incriminated himself, Agent DeCarr, only then, *Mirandized* Mr. Pence [**Exhibit "D"** at p. 147]. Agent DeCarr made a point of telling Mr. Pence before he finally provided a *Miranda* warning, that what he was about to do was merely "some administrative stuff" [**Exhibit "D"** at p. 146-147]. Agent DeCarr never said the word *Miranda* to Mr. Pence and actively downplayed the importance of the critical constitutionally required warning he must provide to the defendant, as "administrative stuff" [**Exhibit "D"** at p. 147].

After providing a *Miranda* warning Agent DeCarr and other agents spent nearly three more hours rehashing what Mr. Pence had told them prior to being *Mirandized* [*see generally* **Exhibit "C"** and **Exhibit "D"**].  Mr. Pence was held in the same location, locked in the same F.B.I. vehicle with the same agents for the entire five-hour period with no break or change in location or any other circumstance. [[**Exhibit "A"** at p. 4, *see generally* **Exhibit "C"** and **Exhibit "D"**].

## LEGAL ANALYSIS

I.   *Miranda* **violations require the suppression of all statements allegedly made by Mr. Pence.**

   *A.  Standards applicable to Fifth Amendment Miranda Analysis.*

The Fifth Amendment requires that no person "be compelled in any criminal case to be a witness against himself". U.S CONST. amend. V.   The essence of the right against self-incrimination "is the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Culombe v. Connecticut*, 367 U.S. 568, 581 (1961). The seminal United States Supreme Court case of *Miranda v. Arizona*, 384 U.S. 436 (1966) identified the pervasive compulsion of custodial interrogation and set forth the now well-known rule that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Law enforcement must warn a defendant, prior to the commencement of custodial interrogation that:

> He has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed… [and if the defendant] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning. *Id.* at 444-445.

In the absence of a proper *Miranda* warning, the prosecution may not use statements made by a defendant to law enforcement during custodial interrogation. *Id.; see also Rhode Island v. Innis¸* 446 U.S. 291, 297 (1980). The admissibility of a defendant's statement hinges on three questions ultimately: [1] was the defendant in custody, [2] was the defendant interrogated, and if yes to both [1] and [2], then [3] was the defendant properly provided a *Miranda* warning?

"When a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered." *Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972). The Government must prove that a defendant's confession was voluntary. *United States v. Capers*, 627 F.3d 470, 477-479 (2nd Cir. 2010) "Accordingly, courts place upon the government the burden to prove that a defendant's confession was voluntary." *Id.*; *see, e.g., Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (stating that the government must establish voluntariness by a preponderance of the evidence).

B. <u>Statements made in response to unwarned custodial interrogation must be suppressed.</u>

The preliminary question in any *Miranda* analysis is a determination as to whether or not a defendant was in custody when he was interrogated. Formal arrest and transport to an interrogation room at a law enforcement office is not necessary to trigger a custodial situation. *See California v. Beheler*, 463 U.S. 1121, 1125 (1983) (stating that even when a formal arrest has not yet occurred, a suspect may be in custody for *Miranda* purposes if his or her freedom of movement is restrained to the degree associated with formal arrest.). To determine if a defendant is in custody for purposes of *Miranda*, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). The objective standard requires the Court to consider what a reasonable person who is neutral to

the purpose of the investigation would consider. *United States v. Bingivenga*, 845 F.2d 593, 596 (5ᵗʰ Cir. 1988) (stating that the reasonable person's perspective is "neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances"). In making its objective determination, the Court must review the totality of the circumstances surrounding the defendant's questioning in its factual inquiry. *Thompson v. Keohane*, 516 US 99, 112-113 (1995) (adopting a totality of the circumstances test for custodial analyses), *see also Miller v. Fenton,* 474 US 104, 113 (1985) (stating that the ultimate question in a custody analysis is whether or not "under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution…."). The Court should evaluate all objective factors in determining that an arrest or restraint on liberty occurred that necessitates a *Miranda* warning prior to interrogating a person. *See Thompson*, 516 U.S. at 113 n.11.

Key factors include:

1. **The location, time, length of the questioning, and length of pre-questioning detention.** *Orozco v. Texas*, 394 U.S. 324, 326-327 (1969) (questioning in defendant's own bedroom at 4:00 am was custodial); *see also United States v. Planche*, 525 F.2d 899, 900 (5ᵗʰ Cir. 1976) (suspect was in custody for *Miranda* purposes when eight to nine officers came to his business and interrogated him for four hours) *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1ˢᵗ Cir. 2007) (ninety minute to two hour interrogation in defendant's home was significant factor in finding defendant in custody).

2. **Whether the police or the defendant initiated the contact.** *Compare Beheler*, 463 U.S. at 1122-23 (1983) (suspect not in custody because he initiated the police contact voluntarily) *with United States v. Lee*, 699 F.2d 466, 467 (9ᵗʰ Cir. 1982) (Defendant in custody when he was asked to get into a police vehicle parked in front of his house and then interviewed); *see also United States v. Guarino*, 629 F. Supp 320, 324-325 (Dist of Conn., 1986) (defendant who was told he was free to leave, but then then placed in a F.B.I. vehicle and questioned, was in custody and should have been *Mirandized*).

3. **The presence and placement of multiple officers during the interrogation.** *See United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993) ("threatening presence of several police officers" made situation custodial); *see also New York v. Quarles*, 467 U.S. 649, 655 (1984) (respondent was in custody when surrounded by four officers and handcuffed); (*United States v. Craighead*, 539 F3d 1073, 1084 (9th Cir 2008) (stating that "the presence of a large number of visibly armed law enforcement officers goes a long way towards

making the suspect's home a police-dominated atmosphere"); *Mittel-Carey*, *supra* at 39-40 (eight officers in home factor in determining defendant was in custody when interrogated).

4. **The display of a weapon by law enforcement.** *See Griffin, supra* ("display of a weapon by an officer" during interrogation means reasonable person would believe they are not free to leave; *compare to United States v. Howard*, 115 F.3d 1151, 1153 (4th Cir. 1997 defendant not in custody where officers did not "brandish their weapons").

5. **The isolation of the defendant from family or friends.** *United States v. Craighead*, 539 F3d 1073, 1087 (9th Cir 2008) (*Miranda* requires that if the F.B.I. isolates the suspect, and the suspect does not reasonably believe he is free to leave, warnings must be given); *United states v. Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007) (finding that defendant was in custody when "Officers purposefully separated [the defendant] from her boyfriend and children and removed her to a back room."); *United States v. Beraun-Panez*, 812 F.2d 578, 582 (defendant in custody when "the interrogation of [the defendant] took place well away from the public view, in a remote area where no passersby would likely be present").

6. **The level of police domination during the questioning.** *Mittel-Carey*, *supra* at 40 (stating that the key factor in that case was "the level of physical control that the agents exercised over the defendant during the search and interrogation" when officers ordered the defendant "to dress, go downstairs, and was told where to sit; he was physically separated from his girlfriend and not allowed to speak to her alone; and he was escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom.").

7. **The nature of the questioning.** *Lee*, *supra* at 468 (defendant was in custody because F.B.I. agents questioned him in a patrol car for over an hour, confronted defendant with evidence of guilt, and told him that "it was time to tell the truth").

No one factor controls. *See Capers*, 516 U.S. at 113.  The Court should consider the totality of the circumstances and all facts that would cause a reasonable person in the defendant's shoes to believe they are not free to stop a law enforcement interaction and leave. *Id.*

The facts in *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982) closely mirror the instant case. In *Lee*, F.B.I. agents asked the defendant if he would agree to be interviewed in an F.B.I. car parked in front of the defendant's house. *Id.* at 467.  Two agents sat in the vehicle with the defendant. *Id.* The defendant was told he was free to leave the car or terminate the interview at any time. *Id.* Police investigators were in and around his house. *Id.* at 468.  The defendant was not read *Miranda* rights.  *Id.* 467. The defendant was then interviewed for an hour and a half. *Id.*  After

allowing the defendant to state an exculpatory story, the F.B.I. agents confronted him and told him it was "time to tell us the truth". *Id.* The defendant's confession followed. *Id.* at 467.

The District Court held that the defendant in *Lee* was in custody for purposes of *Miranda* and should have been given warnings and suppressed his confession. *Id.*  On appeal by the Government, the Ninth Circuit affirmed the suppression of the confession, holding that where a defendant is held in an F.B.I. vehicle for over an hour, confronted with evidence of his guilt, and told to tell the truth, "a reasonable innocent person could conclude that he was not free to leave". *Id.* at 468.  The instant case mirrors *Lee* in virtually every way, with the notable exception that Mr. Pence was never informed that he was 'free to leave' or that he could 'end the questioning at any time.'

*Lee* has been adopted within the Second Circuit.  In *United States v. Guarino*, 629 F. Supp. 320 (Dist. Of Conn. 1986), the District Court, in citing *Lee,* suppressed statements by a defendant who had been handcuffed at his home, then unhandcuffed, driven to a Dunkin Donuts and questioned while being allowed to have coffee. *Id.* at 322-323.  The defendant in *Guarino* spent many hours in direct police contact and was eventually *Mirandized*. *Id.* at 324.  The Court suppressed defendant's pre-*Miranda* statements. *Id.*

Here as in *United States v. Lee*, the totality of the circumstances makes it clear that defendant was in custody in the F.B.I. vehicle when he was questioned by agents.  Each of the seven factors considered by the Court in *Lee* make it clear that by the totality of the circumstances, Mr. Pence was in police custody when he was interrogated.

1.    *The location, time, length of the questioning, and length of pre-questioning detention.*

Mr. Pence was placed in the back of an F.B.I. vehicle outside his residence, just after 7:00 am on Wednesday October 27, 2021 – a workday.  He was held in that vehicle and questioned for

more than five hours. At the time he was placed in the vehicle, armed agents had been in his home for approximately one-hour.  During the hour between the arrival of the F.B.I. and Mr. Pence being placed in the vehicle, he was held at gun point, required to stay with agents, not allowed to move freely in his own home, and told expressly by an F.B.I. Agent, that if he made any quick movements he would be shot [*see* Exhibit "A", Exhibit "C", and Exhibit "D"].

2.    *Whether the police or the defendant initiated the contact.*

The F.B.I. initiated the contact by executing a search warrant at Mr. Pence's home.  But for F.B.I. action there would clearly have been no contact between Mr. Pence and agents [*see* Exhibit "B"].

3.    *The presence and placement of multiple officers during the interrogation.*

More than twenty agents, armed with assault rifles and dressed in riot gear stormed Mr. Pence's home, took him into custody and detained his wife, his parents, and thirteen of his children. Two armed officers sat in the vehicle with Mr. Pence while he was interrogated for more than five hours.  Agents armed with assault weapons remained immediately outside the vehicle, and others remained visible with guns drawn in the area between the vehicle and the front door of his home. More still were in his home with guns displayed [*see* Exhibit "A" and Exhibit "B"].

4.    *The display of a weapon by law enforcement.*

As noted above, a few dozen agents stormed Mr. Pence's home brandishing AR-15 style assault weapons as well as handguns.  During the five hours Mr. Pence was interrogated in the F.B.I. vehicle, agents surrounding the vehicle continued to display those weapons [*see* Exhibit "A", Exhibit "B", Exhibit "C" and Exhibit "D"].

5.    *The isolation of the defendant from family or friends.*

Mr. Pence was taken from his home where seventeen of his family members live and questioned in isolation by multiple F.B.I. agents in a government vehicle, for more than five hours. Mr. Pence's wife Michelle requested they speak on five separate occasions and was not allowed to have contact with Mr. Pence [*see* **Exhibit "A"**, **Exhibit "B"**, and **Exhibit "C"**].

6.    *The level of police domination during the questioning.*

The entire five-hour interrogation was recorded and speaks for itself.  No reasonable person in the defendant's shoes would believe they are free to terminate an interrogation and leave when they are held in an F.B.I. vehicle with multiple agents while additional agents stand outside the vehicle sporting AR-15 assault rifles. If a person in Mr. Pence's shoes were to terminate questioning and ask to leave, where would that person even go, when agents have stormed his home and remain there sporting assault weapons?  Critically, Mr. Pence was not told he was free to leave, but was told, if he made any quick movements he would be shot [*see* **Exhibit "A"**, **Exhibit "B"**, and **Exhibit "C"**].

Notably, as in *Lee supra*, Mr. Pence was superficially told at the outset of the interrogation that he was not under arrest, after he was taken into custody and placed inside the F.B.I. vehicle with two agents and that vehicle was then surrounded by multiple agents guarding the vehicle with AR-15 style weapons in plain view.  The Court here should mirror the 9th Circuit's holding in *Lee* that a mere recitation by an agent that a defendant is not under arrest is insufficient to prove a defendant is not in custody. Here, the factual circumstances clearly evidence a custodial situation. Law enforcement is not somehow absolved from complying with the rule in *Miranda* by merely telling an individual who is held at gun point, that they are not under arrest [*see* **Exhibit "A"**, **Exhibit "B"**, and **Exhibit "C"**].

7.    *The nature of the questioning.*

The questioning Mr. Pence was subjected to by the agents is very clearly designed to make him admit the crimes alleged here.   The recordings speak for themselves.   Mr. Pence was questioned about the use of his computers and who has access to them.  He was questioned about his knowledge of the dark web.  He was shown and asked to authenticate emails he was alleged to have sent, which implicate him in the plot alleged here.  He was questioned as to motive.  Mr. Pence was presented with specific and detailed evidence and questioned in detail about his involvement. There is simply no reasonable conclusion that could be drawn from a review of the F.B.I. agents' questioning of Mr. Pence that would not lead a reasonable person to believe they were in custody during said interrogation. [*see* **Exhibit "A"**, **Exhibit "B"**, **Exhibit "C"**, and **Exhibit "D"**].

Telling is the fact that the agents did ultimately administer a *Miranda* warning to Mr. Pence, while in the vehicle, albeit, after they interrogated him for hours and secured the sought-after incriminating statements [*see* **Exhibit "D"** at p. 147].  Nothing changed about Mr. Pence's factual situation before and after he was *Mirandized*.  Mr. Pence was not questioned vaguely or generally; he was presented with damming evidence and interrogated in a textbook manner, while in custody in a police vehicle, and then, after making the critical admissions, read *Miranda* warnings. No reasonable person in the defendant's shoes, when considering the totality of the circumstances, could believe they were free to end the police contact and leave that situation voluntarily in this situation.

C.    <u>*The defendant's statements were clearly the product of intentional custodial interrogation by F.B.I. Agent DeCarr.*</u>

Interrogation is "express questioning" or its "functional equivalent" by law enforcement officers "reasonably likely to elicit an incriminating response" *See Rhode Island v. Innis¸ supra* at

301; *see also United States v. LaPierre,* 998 F.2d 1490, 1466 (9th Cir. 1993) (stating that the Court should consider all objective factors indicating that questioning will likely elicit an incriminating response). *Innis* is the seminal case.  It clearly defines interrogation:

> [T]he term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Innis supra at* 301.

Requests for predicate information like a defendant's name and address are not subject to *Miranda*, but where a defendant is questioned by law enforcement and its reasonably likely that the questioning could cause the defendant to make incriminating statements, *Miranda* warnings must be given before the commencement of the questioning. *Id.*  Subtle coercion is prohibited, just as direct questioning would be *Id.*

Here there was nothing subtle about the questioning of the defendant.  F.B.I. Agents entered Mr. Pence's home with assault weapons, refused to allow him to move freely in his home, and told him he would be shot if he made any quick moves.  Agents removed him to an F.B.I. vehicle.  Two armed agents sat in the car with him while others stood guard, dressed in full body armor and brandishing assault weapons, for five hours [*see* **Exhibit "A"**, **Exhibit "C"**, and **Exhibit "D"**].

Under no reasonable interpretation could the questioning captured in Exhibits "C" and "D" be considered anything other than interrogation.  As the recording shows, Agent DeCarr went through significant minute details of what he alleged Mr. Pence was involved in, to hammer home his belief that Mr. Pence was engaged in the alleged plot.  Agent DeCarr, after hours discussing the details of the plot, affirmatively asked Mr. Pence to incriminate himself:

> **Agent DeCarr**: So this is the- I- I know it's tough to hear out loud, right, but we're in- we're in private. So, what you're telling me is that, you paid fifteen thousand

> dollars, on the murder for hire website, to have Francisco Cordero and Christina
> Cordero killed.
> **Mr. Pence**: Yes. [**Exhibit "D"** at p. 121-122]

Summarizing the entire theory of his investigation and asking Mr. Pence to confirm his guilt makes

clear, the Agents had no intention other than to cause Mr. Pence to incriminate himself and arrest

him, and in an effort to avoid deterring him from making admissions, did not *Mirandize* Mr. Pence

prior to interrogating him.  Agent DeCarr continued to question Mr. Pence on the details of the

transaction.  The net result being another summary question in which Agent DeCarr asked Mr.

Pence to incriminate himself directly a second time:

> **Agent DeCarr**: Okay. Alright, so, you made a decision. You negotiated with the
> administrator of the murder for hire website. You transferred money to the murder
> for hire website for the hit on Christina Cordero and Francisco Cordero. Am I- am
> I correct so far?
> **Mr. Pence** (Unintelligible response)
> **Agent DeCarr** I'm sorry?
> **Mr. Pence:** Yes. [**Exhibit "D"** at p. 128]

The issue here is that this questioning took place while Mr. Pence was held in an F.B.I. vehicle,

surrounded by armed guards, and before he was read *Miranda* warnings.

Agent DeCarr continued interrogating Mr. Pence, ultimately telling him he had what he

called "administrative stuff" to go over with Mr. Pence, and then *Mirandizing* him after more than

two hours of custodial interrogation [**Exhibit "D"** at p. 147]. Mr. Pence was interrogated for hours,

asked to provide detailed facts about the alleged crime, and on multiple occasions directly asked

to incriminate himself, then *Mirandized*. This is an illegal interrogation tactic that requires the

suppression of the entirety of Mr. Pence's statement.

**II.   Mr. Pence was subjected to an illegal, deliberate two-step interrogation technique
undermining the defendant's *Miranda* rights and requiring suppression of the
entirety of the defendant's statement.**

An interrogation technique involving sequential unwarned and warned interrogations

presents a unique *Miranda* challenge. *Missouri v. Seibert*, 542 U.S. 600, 609 (2004). When law

enforcement officials provide a defendant with belated *Miranda* warnings after having already subjected that defendant to custodial interrogation, the threshold question concerning the admissibility of the post-warning statements is "whether in the circumstances the *Miranda* warnings given could reasonably be found effective." *Id.* at 612 & n.4. That is, could a defendant truly comprehend his right to be silent or ask for the representation of counsel after he has already been questioned, without the benefit of a reminder of those rights, and thus provided incriminating statements? The answer to the question of whether a downstream Miranda warning was effective requires the consideration of certain factors, including:

1.  The completeness and detail of the questions and answers in the first round of interrogation;

2.  The overlapping content of the two statements;

3.  The timing and setting of the first and second interrogation;

4.  The continuity of police personal; and

5.  The degree to which the interrogator's questions treated the second round as continuous with the first.  *Id.* at 615.

The fifth Seibert factor – "continuous treatment of the separate interrogations" necessitates "consideration of whether the warnings that were administered included a warning that the statement previously made is inadmissible." *United States v. Cohen*, 372 F. Supp. 2d 340, 355 (E.D.N.Y. 2005). The use of a "question-first" interrogation technique whereby law enforcement subjects a suspect to unwarned custodial interrogation until securing a confession and then, after administering *Miranda* warnings, again seeks to elicit the same incriminating statements, violates the suspect's Fifth Amendment rights because "the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning." *Seibert supra* at 604, 611.

In *Seibert,* police officers secured a custodial confession from an eighteen-year-old youth without a *Miranda* waiver then later obtained a second confession following proper *Miranda*

warnings. The Supreme Court held that the entirety of the defendant's confession could not be admitted because after interrogating the defendant without a *Miranda* warning, law enforcement took a twenty-minute break, then *Mirandized* the defendant and obtained a second confession that mirrored the first one. *Id.* The Supreme Court suppressed the statement because both phases of the questioning occurred while the suspect was clearly in custody, there was no advice given to the suspect that her first statement was inadmissible, the same police officer conducted both interrogations, the interrogations were in the same location, and there was only a 15-20 minute break between the two interrogations. *Id.* at 617.

Here, Mr. Pence was clearly subject to a two-step interrogation. Mr. Pence was placed in the F.B.I. Tahoe and surrounded by armed guards, then questioned for approximately two hours on the express details of the alleged crime. All five of the factors set out in *Seibert* apply here.

(1) The pre-*Miranda* first round of questioning was complete, and it was during that period of questioning that Mr. Pence made the majority of his incriminating statements.

(2) The overlapping content of the two statements was significant. To be clear, Mr. Pence provided a complete confession as the result of Agent DeBarr's questioning, prior to his being issued any *Miranda* warning. The post-*Miranda* questioning of Mr. Pence was exclusively confirmatory in its nature, reviewing what he had said prior to being read warnings and asking him to authenticate incriminating emails. His statements authenticating these documents and every detail of his post-*Miranda* statement*s* directly overlap with his pre-*Miranda* interrogation.

(3) The time and setting of the "first" and "second" interrogations here are no different. Mr. Pence was placed in government vehicle, questioned for hours, then read *Miranda* warnings that Agent DeCarr characterized as mere "administrative stuff", and then questioning continued. There was no break in time or change in setting between the pre- and post-*Miranda* questioning.

(4) The continuity of police personnel is straightforward here.   Agent DeCarr directly questioned Mr. Pence for hours, then *Mirandized* Mr. Pence, then continued to question him for two more hours. Two other agents played minor roles in the post-*Miranda* questioning.   Within the context of the recorded conversation, it is clear that they were participating with Agent DeCarr. Critically, there was literally no temporal break between the pre- and post-*Miranda* questioning and no change in location. Brief questioning from a secondary agent involved in the investigation certainly does not cure the *Miranda* violation here.

(5) Here there was literally no break or other factual change.   Agent DeCarr questioned Mr. Pence for a total of more than five hours.   In the middle of that questioning he told Mr. Pence he had to take care of "administrative stuff" and *Mirandized* him, then he continued questioning him as he had prior to reading him a warning.   The questioning was clearly one continuous round, with a *Miranda* warning in the middle.

*Deliberateness of the Two-Step Interrogation Tactic*

*Seibert* made clear that a deliberate two-step interrogation process is a violation of *Miranda* requiring the suppression of a defendant's statement. *Seibert, supra* at 609, 612.   The record in *Seibert* was clear that the two-step interrogation process employed by law enforcement there was a deliberate tactic, and the Court did not address a method to determine deliberateness of the two-step process.   *Seibert, supra* at 609-610.   Circuit Courts around the country have adopted a totality of the circumstances analysis in determining if a two-step interrogation was deliberate. *United States v. Capers*, 627 F.3d 470, 477-479 (2nd Cir. 2010); *see also U.S. v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006) (stating that the Court must consider "objective evidence and any available subjective evidence, such as an officer's testimony support, an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning"); *see also U.S. v. Street*, 472

F3d 1298, 1314 (11th Cir. 2006) (quoting *Williams supra* and adopting a totality of the circumstances test).

In *Capers supra* the Second Circuit highlighted a number of factors useful in identifying a deliberate application of a two-step interrogation used to circumvent *Miranda*. Those factors include:

1. Overlap between the suspect's first and second statements;

2. Whether different officers questioned the suspect at different locations and if so, was the second officer aware of a suspect's previous inculpatory statements;

3. If the post warning questioning is a continuation of the prewarning questioning. *Capers, supra* at 478 *citing U.S. v. Carter,* 489 F.3d 528, 536 (2nd Cir. 2007).

The Second Circuit held that the two-step interrogation that Mr. Capers had been subjected to violated his constitutional rights and suppressed his confession. The agent who had questioned the defendant in that case testified that he delayed in providing the defendant with a *Miranda* warning to be sure he could preserve evidence, and to determine if a co-defendant played a role in the alleged crime. The agent also testified that he was in a position to read *Miranda* warnings during the first round of questioning, although he did not. *Capers, supra* at 480. The Second Circuit held that the delays cited by the agent in *Capers* did not justify interrogation without a *Miranda* warning. The Court stated:

> There is no exception to *Miranda* that allows delay in giving *Miranda* warnings in order to preserve evanescent evidence. Neither is there an exception to *Miranda* that permits delaying the warnings in order to ascertain whether a suspected co-conspirator may be entitled to release. *Id.*

The Court held that the use of the two-step interrogation was deliberate, that the facts provided no evidence of sufficient curative efforts by the agent, and that suppression of the defendant's statement in that case was necessary. *Capers, supra* at 484-485.

Here, the two-step process was clearly deliberate. There was complete overlap between the pre- and post-*Miranda* statements of Mr. Pence.  Agent DeCarr did the vast majority of all of the questioning both pre- and post-*Miranda*.  The entire five plus hour statement was taken in the same location, and the recorded statement makes it clear that the minimal additional questioning by other agents was directly associated with Agent DeCarr's lengthy interrogation. The plausibility of the other agents on the recording simply being unaware of Agent DeCarr's questioning would be incredible given the factual situation. The post warning questioning was a direct continuation of the pre-warning questioning with no break in time, change in location, or change in the people involved.  This was clearly a deliberate two-step interrogation designed to circumvent Mr. Pence being read a *Miranda* warning before Agent DeCarr could obtain incriminating statements from him.

Critically, Agent DeCarr mislead Mr. Pence telling him they were only there to figure out somethings, and ultimately told him his *Miranda* warnings were mere administrative stuff.  If there was ever evidence of deliberate circumvention of *Miranda* surely it is here.

## III.    No exception to the requirements of *Miranda* applies here.

Nothing about this situation would qualify for any of the exceptions to *Miranda*.  The defense anticipates the Government may argue that the public safety exception should be applied here.  This exception is applicable where a significant threat to public safety presents itself and law enforcement ask spontaneous questions to preserve safety. *See New York v. Quarles,* 467 U.S.649. 655-656 (1984) (stating the public safety exception applied when a police officer, while patting down a suspect in a rape case, discovered the suspect was wearing an empty gun holster, and asked the suspect prior to *Mirandizing* him where the gun was.); *see also U.S. v. Estrada*, 430 F.3d 606, 612 (2nd Cir. 2005) (the stating the public safety exception applied where officers asked

a suspect if there were guns in the apartment they were in at the time of the questioning); *compare with U.S. v. Rumble*, 714 F.Supp 2d 388, 391-392 (NDNY 2010) (public safety exception did not apply because the Government failed to prove there was an urgent need for the information gleaned from the pre-*Miranda* questioning, when the defendant was questioned outside of his home and the information gleaned was not communicated to individuals inside of his home).

Our case is conceptionally identical to *Rumble.* Mr. Pence was patted down and removed from his home and placed in a secure F.B.I. vehicle.  He was then questioned about the details of an alleged murder-for-hire plot in which the agents believed he used the internet to seek out a hitman.  The agents acknowledged early in their questioning that they had uncovered a website involving hitmen and that there was no hitman acting on any alleged order at that time.  Nothing in the recorded questioning indicates the agents were particularly concerned for their safety or were concerned that the dozens of armed agents inside Mr. Pence's home were in harm's way, or that anyone else was in harm's way.  Agent DeCarr did not rapidly communicate information he obtained from Mr. Pence to agents inside Mr. Pence's home.  And there was simply no urgency to the questioning.  Glaringly, Agent DeCarr opened the five-hour questioning block with questions about Mr. Pence's work, his access to the internet and who in his family accesses what electronic devices.  He did not ask Mr. Pence a single question about weapons or any other dangerous items in a way that could be even roughly construed as an urgent public safety concern during the entire interrogation.  Agent DeCarr asked Mr. Pence about guns once, when he confirmed that the firearms in his office were legally possessed.  That questing came approximately two hours into the interview (**Exhibit "D"** at p. 144).  No *Miranda* exception applies here.

## IV.    AN EVIDENTIARY HEARING IS REQUIRED

Mr. Pence requests an evidentiary hearing on this motion.  A hearing is warranted to thoroughly explore the conditions of the interrogations Mr. Pence endured, the involuntariness of his waiver of his Fifth Amendment rights, and the unduly coercive aspects of the interrogations that warrant suppression of his statement and physical evidence seized pursuant to those interrogations.  The defense has submitted a sworn first-hand account in support of its suppression motion, and, in accordance with the standard for an evidentiary hearing, has submitted sufficient facts that, if credited, show that exclusion of the evidence is required.  *See United States v. Culotta,* 413 F.2d 1343, 1345 (2d Cir. 1969); *United States v. Ahmad,* 992 F. Supp. 682, 685 (S.D.N.Y. 1998).  Thus, Mr. Pence respectfully requests that, at a minimum, the Court hold a hearing on the motions.

## CONCLUSION

For the foregoing reasons, Mr. Pence respectfully requests that the Court grant an Order suppressing all statements made by Mr. Pence, the physical evidence based on those statements, and any other fruits of the illegal custodial interrogation, and granting such other and further relief as the Court deems proper.

Dated:    December 20, 2022
         Albany, New York

                                  Schillinger & Associates, PLLC

                              By: _____
                                  Eric K. Schillinger
                                  Bar Roll No.: 516083
                                  *Attorney for Defendant Christopher Pence*
                                  11 North Pearl Street, Suite 1700
                                  Albany, New York 12207
                                  (518) 595-9529
                                  eric@schillinger-law.com