# EXHIBIT 1

DeCarr Declaration

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*******************************************

UNITED STATES OF AMERICA,

                           Case No.:     1:21-CR-393 (DNH)

     v.

CHRISTOPHER PENCE,

                 Defendant.

*******************************************

## DECLARATION OF BRIAN DECARR

Pursuant to 28 U.S.C. § 1746 and under penalties of perjury, BRIAN DECARR declares as follows:

1)    I, Brian DeCarr, am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since January 2020. I am currently assigned to the Albany, New York Field Office. My current duty assignment is with the Office's Counterintelligence Squad. I was previously assigned to the Capital District Safe Streets Task Force in Albany. In that assignment, I worked with federal, state, and local law enforcement agents and officers in investigating criminal activities such as violent crime, transnational organized crime, and gangs. Prior to my employment with the FBI, I was a New York State Trooper from May 2018 until January 2020, and was a Police Officer for the Pentagon Force Protection Agency from June 2017 until May 2018. I have participated in the execution of numerous warrants involving the search and seizure of weapons,

1

drugs, financial records, computers, computer equipment, software, and electronically stored information.

2)      On October 27, 2021, I participated in the execution of a federal search warrant at the defendant CHRISTOPHER PENCE's residence located at 2929 South 6500 West, Cedar City, Utah.  I obtained the search warrant from U.S. Magistrate Judge Paul Kohler in St. George, Utah. My primary assignment was to coordinate any interview of the defendant as part of the investigation of a murder-for-hire.

3)      On the above date, a team of law enforcement agents from the FBI, HSI, U.S. Marshalls and the Iron County Sheriff's Office executed the warrant on the defendant's residence (2929 South 6500 West, Cedar City, Utah).  The residence, located on a 20-acre property in the desert of southwest Utah, is a tan-colored, three-story, single family, 7-bedroom, approximately 5,800 square foot house approximately 500 feet east of South 6500 West, accessed by a combination paving and gravel driveway leading from South 6500 West.  The attached aerial photographs of the residence were taken several weeks before the execution of the search warrant, but accurately depict the residence and surrounding property on October 27, 2021, apart from a portion of the driveway having been paved in the intervening period.

4)      At approximately 6:30 a.m., with the temperature in the 30s Fahrenheit, I approached the door to the residence and knocked on the door.  The defendant answered the door.  I introduced myself and notified the defendant that I had a search warrant for the residence.  The defendant then allowed investigators – consisting of approximately 14 law enforcement agents wearing bullet-proof vests under their jackets – into the residence.  None of the agents were equipped with any other tactical riot gear (*e.g.*, full-body protection, riot helmets with visors, fixed-length batons, shields, or gas masks).

2

5)      As the team of investigators entered the residence, the agents held their weapons – a combination of handguns and rifles – in the "low-ready" position, pursuant to their training and based on information that the defendant possessed weapons in the residence. A shotgun was, in fact, encountered in the defendant's home office.

6)      After entering the residence, the team of agents spread out through the large house to ensure there were no safety hazards to the agents and no destruction of evidence taking place. The defendant's family, including his wife, parents and children, were escorted from their various locations around the residence to the first floor living room. At no point were any firearms pointed at the defendant or members of his family. Once the residence was cleared, all of the agents that I saw had holstered their handguns or shouldered and/or stowed their rifles in their vehicles. The agents then set about their assigned tasks, which included interviewing the residents, seizing evidence and previewing electronic devices, as authorized by the warrant, and photographing the residence.

7)      I did not observe any visibly upset adults or children during the clearance process. Furthermore, at no point was the defendant prevented from speaking with any of his family members as they made their way to the living room. At no point did I observe any resident placed in handcuffs.

8)      Towards the end of the process of securing the residence, I asked the defendant if he was willing to speak with myself and SA Andersen either in his residence or in our vehicle outside the residence. The defendant, appearing relaxed and agreeable, readily agreed to speak with us in the vehicle. Without attempting to speak with his family, the defendant indicated that he needed to retrieve his shoes from his upstairs bedroom, which he did.

3

9)      At the time I asked the defendant if he was willing to speak with SA Andersen and me, I did not believe that I had sufficient evidence to arrest the defendant for the murder-for-hire, which would require probable cause. This was because although I strongly suspected that the defendant was, in fact, responsible for the Darknet communications and Bitcoin payments in connection with the murder-for-hire, it was also possible that someone else in the residence (*e.g.*, his wife and/or his parents) who had access to the defendant's electronic devices and/or financial accounts could have been responsible, which is why the other residents of the house were also interviewed. To be clear, I did not have an arrest warrant for the defendant prior to the execution of the search warrant.

10)     After retrieving his shoes, the defendant put on a jacket, exited the residence, approached the vehicle – a Chevrolet Tahoe seven-seat SUV – on his own, opened a passenger door, and got in. No other agents were anywhere near the vehicle at this time, except for SA Andersen and me.

11)     At no point during the interview did anyone yell or threaten the defendant, nor were weapons purposefully displayed or brandished. Furthermore, the doors to the vehicle were never locked during the interview, the driveway to the residence was not blocked by law enforcement vehicles, and no agents were posted outside the vehicle until after the defendant was placed under arrest.

///

///

///

///

///

12)      Because this affidavit is being submitted for the limited purpose of responding to a motion to suppress evidence, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to respond to factual allegations contained in the defendant's motion to suppress statements and evidence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   January 24, 2023

Albany, New York

5





