UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v-                                                  1:CR-393-DNH

CHRISTOPHER PENCE,

                Defendant.

**POST HEARING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

SCHILLINGER & ASSOCIATES, PLLC
Eric K. Schillinger, Esq.
Bar Roll.: 516083
*Attorney for Defendant Christopher Pence*
11 North Pearl Street, Suite 1700
Albany, New York 12207
(518) 595-9529
eric@schillinger-law.com

Schillinger & Associates, PLLC, Eric K. Schillinger, Esq, of counsel, represents the accused, Christopher Pence.

## SUMMARY

Defendant Christopher Pence has been indicted on one count of Use of a Facility of Interstate Commerce in Connection with Murder for Hire in violation of 18 U.S.C. Section 1958(a) [*see* 1:21CR-393 DNH ECF Doc. 4].  Mr. Pence moved this court by Motion filed December 20, 2022, for the suppression of evidence obtained in the underlying investigation, chiefly statements he made to F.B.I. Agents Brian DeCarr and Chris Andresen on October 27, 2021 during an interrogation conducted in a Chevrolet Tahoe outside Mr. Pence's home.  The critical issue at bar is whether Mr. Pence was in custody when he was interrogated by law enforcement.  The simple answer is yes, and the lawful result is the suppression of his statements to Agents DeCarr and Andersen.

Suppression hearings were held June 8, 2023 before the Hon. David N. Hurd, at the United States Court House in Utica New York. Agents DeCarr and Andersen, as well as Agent Patrick Lydon testified on behalf of the Government.  Michelle Pence, the defendant's wife, and defendant Christopher Pence testified on behalf of the defense.

## FINDINGS OF FACT

Before dawn on October 27, 2021, fourteen men armed with rifles, pistols, a ballistic shield, sledgehammers, and breaching tools, all lined up at the front door of defendant Christopher Pence's home in Cedar City, Utah. [1:21CR-393 DNH ECF Doc. 43 (hereafter Transcript) at P. 9 Line 13-24; P. 35 Line 12-23; P. 36, Line 1-10; P. 130, Line 16-18, P. 36 Line 1-10,]. These men planned to breach Mr. Pence's front door, secure his home, search it, and interrogate Mr. Pence. The men wore bullet proof vests, some of them wore helmets, and all of them, per F.B.I. policy,

held their guns in the "low-ready" position. [Transcript at P. 93 Line 15-P. 94 Line 16]. Low-ready is a law enforcement term that means the men held their guns in their hands and were prepared to fire them at a moment's notice. [Transcript at P. 11 Line 21-25, P. 12 Line 1]. These fourteen men were part of a group of a total of twenty-one agents and civilian employees of the F.B.I. and local law enforcement who traveled to Mr. Pence's home to investigate an alleged murder for hire plot that had wound its way from upstate New York to Southern Utah. [Transcript at P. 32 Line 17- P. 33 Line 4].

Two men led the group as it prepared to gain access to the home that day - agents Brian DeCarr and Chris Andersen. Agent DeCarr was the case agent assigned to the investigation in New York State. [Transcript at P. 4 Line 15-19]. He had a search warrant and intended to locate and interrogate Mr. Pence. [Transcript at P. 60 Line 15-24]. Agent DeCarr did not have probable cause to arrest Mr. Pence, and his journey to Utah was made with the goals of executing the warrant and obtaining an incriminating statement from Mr. Pence. [Transcript at P. 23 Line 22-25, P. 24 Line 1-4].

Agent Andersen was the local operations planning agent for the case in Utah. [Transcript at P. 66 Line 7-11]. Per his plan, twenty-one law enforcement and civilian employees traveled in a vehicle caravan with twelve or thirteen vehicles arriving at the Pence's home at approximately 6:45 am.  [Transcript at P. 78 Line 2-9, P. 83 Line 11-14]. The array of vehicles included marked law enforcement vehicles, a mobile operations van, pickup trucks and SUVs.  [Transcript at P. 84 Line 11-24]. A black Chevrolet Tahoe rented by Agent DeCarr for use in his investigation played a key role.

With thirteen armed agents lined up behind him, Agent DeCarr knocked on Mr. Pence's door at 6:48 am. [Transcript at P. 9 Line 3]. When Mr. Pence opened the door, "it felt like

2

Armageddon had come to [his]. front door and [he]. was the only one standing in the way." [Transcript at P. 130 Line 12-14]. Mr. Pence saw the sledgehammers. [Transcript at P. 130 Line 16-18]. He knew the agents were coming in whether he let them in or not. [Transcript at P. 130 Line 16-18]. The armed men flowed into his house and fanned out to secure the residence. [Transcript at P. 49 Line 5-24]. Agent DeCarr directed Mr. Pence to bring his family members from the second floor of the home to the first-floor family room. [Transcript at P. 133 Line 1-3]. When Mr. Pence started up the stairs to get his parents, wife, and young children, he was stopped. [Transcript at P. 133 Line 5-6]. Armed agents prevented him from moving freely in his home. [Transcript at P. 133 Line 5-6]. Mr. Pence was told to verbally call his family downstairs. [Transcript at P. 133 Line 6-10]. Chris called upstairs to his wife and parents, and they made their way down to the family room. [Transcript at P. 133 Line 10-13]. Agents corralled Mr. Pence's children, his parents, and his wife into the family room of the home by 7:00 am, while armed agents moved about the house securing and searching the property. [Transcript at P. 18 Line 17-20 or P. 106 Line 14-18]. Mr. Pence was separated from the rest of his family in the front of the house. [Transcript at P. 93 Line 7-14]. The sun had barely come up.

After the agents secured the property Agent DeCarr approached Mr. Pence and told him he needed to speak with him outside.[1] [Transcript at P. 133 Line 18-21]. Agent DeCarr had planned to use the rented Chevy Tahoe as the location to interrogate Mr. Pence [Transcript at P. 19 Line 17-22]. Mr. Pence was not wearing shoes. [Transcript at P. 134 Line 3]. He indicated he needed his shoes to go outside and started up the stairs to get them. [Transcript at P. 134 line 4-5]. Again,

---

[1] Agent DeCarr minimized his tone during his testimony, stating "I asked him if he had anywhere, he would like to talk or if he would like to talk to us at all?" [Transcript at P. 14 Line 21-23]. Agent DeCarr also testified that at inception the F.B.I. operational plan included interrogating Mr. Pence in the Tahoe. [Transcript at P. 19 Line 17-22]. Agent DeCarr's candid testimony as to the operational plan lends credibility to Mr. Pence's recalling being given no option but to talk in the truck.

3

he was not allowed to move freely in his home. [Transcript at P. 134 Line 5-6]. Instead, an armed agent accompanied Mr. Pence to his bedroom to get his shoes. [Transcript at P. 134 Line 5-6]. He was told to move slowly. He was told if he did not, he would be shot. [Transcript at P. 134 Line 10-12].

When Mr. Pence returned downstairs with his shoes, he was shown the door, and Agents DeCarr and Andersen walked with Mr. Pence to the Chevy Tahoe. [Transcript at P. 134 Line 24- P. 136 line 10]. Agent DeCarr had gone to the truck while Mr. Pence was getting his shoes, to prepare it for the interrogation. [Transcript at P. 19 Line 13-16]. He removed his bullet proof vest and placed it in the truck and began the audio recording that ultimately was filed as 1:21CR-393 DNH ECF Doc. 21-5 here. [Transcript at P. 19 Line 13-16]. Mr. Pence was directed to the Tahoe by Agents DeCarr and Andersen, who walked with him to the vehicle. They directed him to get in the vehicle on the rear driver-side and they joined him in the vehicle. [Transcript at P. 134 Line 24-P. 136 line 10].

Agents DeCarr and Andersen did not read a Miranda warning to Mr. Pence prior to getting in the Tahoe. Instead, Agent DeCarr told Mr. Pence "you have no obligation to speak with us" when he began his questioning. [Transcript at P. 22 Line 12]. Agent DeCarr's actively sought to obtain a confession from Mr. Pence and rather than respect Mr. Pence's *Miranda* rights he elected to proceed without a proper warning.

Agent DeCarr was candid during his testimony about the weak nature of his case prior to his trip to Utah. He acknowledged that he did not have the necessary evidence to arrest Mr. Pence, and that he needed to obtain a confession from Mr. Pence. [Transcript at P. 23 Line 22 - P. 24 line 1]. He acknowledged that he planned to do so before ever arriving at Mr. Pence's home. [Transcript at P. 19 Line 17-22].

4

The risk of bright lining the seriousness of Mr. Pence's situation to him (as is constitutionally required) by reading him the standard *Miranda* warning recognized by anyone who has ever watched a television police drama was too risky for Agent DeCarr. He needed to guarantee a confession and could not risk reminding Mr. Pence that he had an absolute right to remain silent, an absolute right to an attorney, or that anything he said or did would be used against him. Instead, he soft played the situation "you're under no obligation to speak to us", was what Mr. Pence heard. What Mr. Pence saw however, was armed F.B.I. Agents dominating his surroundings, holding his entire large family in a room, while armed agents secured his home. Actions speak louder than words - no reasonable person in Mr. Pence's shoes would meet Armageddon at the front door, and view the demands of the intruders as optional.

## CONCLUSIONS OF LAW

### POINT I
### CHRIS PENCE WAS IN CUSTODY WHEN HE WAS ESCORTED BY ARMED AGENTS OUT OF HIS HOME AND DIRECTED TO A POLICE VEHICLE FOR A PLANNED INTERROGATION.

Mr. Pence was not *Mirandized* prior to being interrogated here. He was in custody when Agents DeCarr and Andersen interrogated him for five hours. His confession must be suppressed. *Miranda v. Arizona*, 384 U.S. 436 (1966). It is well accepted that no formal announcement of an arrest and transport to an interrogation room at a law enforcement office is necessary to trigger a custodial situation. *See California v. Beheler*, 463 U.S. 1121, 1125 (1983) (stating that even when a formal arrest has not yet occurred, a suspect may be in custody for *Miranda* purposes if his or her freedom of movement is restrained to the degree associated with formal arrest.). No reasonable person in the defendant's shoes would ever consider the facts of Mr. Pence's case to represent a voluntary police encounter that could be terminated at any time. *See Berkemer v. McCarty*, 468

U.S. 420, 442 (1984). Mr. Pence's freedom of movement was clearly restrained in a way that would be consistent with formal arrest as he was taken by armed agents who had raided his home before dawn and directed to a police controlled vehicle for a preplanned five hour interrogation.

The Court must look at the totality of the circumstances in applying the reasonable person standard. *Thompson v. Keohane*, 516 US 99, 112-113 (1995). The Court should evaluate all objective factors in determining that an arrest or restraint on liberty occurred that necessitates a *Miranda* warning prior to interrogating a person. *See Thompson*, 516 U.S. at 113 n.11. Here, every one of the factors to be considered indicates an objective custodial situation.

1. **The location, time, length of the questioning, and length of pre-questioning detention.** *Orozco v. Texas*, 394 U.S. 324, 326-327 (1969) (questioning in defendant's own bedroom at 4:00 am was custodial); *see also United States v. Planche*, 525 F.2d 899, 900 (5th Cir. 1976) (suspect was in custody for *Miranda* purposes when eight to nine officers came to his business and interrogated him for four hours) *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (ninety minute to two hour interrogation in defendant's home was significant factor in finding defendant in custody).

Mr. Pence was removed from his home and questioned in a police-controlled vehicle for nearly two hours before being confronted about the instant allegations and without a *Miranda* warning, and for more than five hours total. He did this while two officers sat with him in the vehicle, and nineteen other armed government agents moved through his house and outside his property. He was held for nearly two hours before being confronted with the allegations he faces now

2. **Whether the police or the defendant initiated the contact.** *Compare Beheler*, 463 U.S. at 1122-23 (1983) (suspect not in custody because he initiated the police contact voluntarily) *with United States v. Lee*, 699 F.2d 466, 467 (9th Cir. 1982) (Defendant in custody when he was asked to get into a police vehicle parked in front of his house and then interviewed); *see also United States v. Guarino*, 629 F. Supp 320, 324-325 (Dist of Conn., 1986) (defendant who was told he was free to leave, but then then placed in a F.B.I. vehicle and questioned, was in custody and should have been *Mirandized*).

There is perhaps no more bright-line police-initiated conduct than the execution of a search warrant at a person's residence before dawn on a work day. Agent DeCarr, almost immediately after

6

gaining access to Mr. Pence's, house told Mr. Pence he wanted to question him. Much like *Lee* and *Guarino supra* Mr. Pence was escorted to a police vehicle in front of his house and then interviewed. He was told "he was under no obligation" to speak to Agent DeCarr, but he was not properly *Mirandized*. *Guarino* and our case are nearly exactly the same and the same result is appropriate – suppression of the defendant's statements. In both cases, the defendants were told they were not under arrest but then held in police vehicles and questioned. Objectively this is a situation where Miranda is *required*.

3. **The presence and placement of multiple officers during the interrogation.** *See United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993) ("threatening presence of several police officers" made situation custodial); *see also New York v. Quarles*, 467 U.S. 649, 655 (1984) (respondent was in custody when surrounded by four officers and handcuffed); (*United States v. Craighead*, 539 F3d 1073, 1084 (9th Cir 2008) (stating that "the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere"); *Mittel-Carey*, *supra* at 39-40 (eight officers in home factor in determining defendant was in custody when interrogated).

A total of twenty-one officers were present when Mr. Pence was taken into custody. When he was removed from his house, he had just seen fourteen armed officers enter and secure it. He saw armed officers standing watch over his family, and then was asked to speak with Agent DeCarr in the Tahoe. During his interrogation two officers were seated in the Tahoe with Mr. Pence, while the remaining nineteen moved in and out of view moving about his property while engaged in the execution of the search warrant. Mr. Pence also saw the vehicles of the agents – thirteen in total and more than he had ever seen previously (despite having hosted church events) at his home. When he made initial contact the agents were all visibly armed, and per F.B.I. policy, held pistols and rifles at the low-ready position and were ready to be quickly brought to bear if necessary. This was a police dominated atmosphere.

7

4. **The display of a weapon by law enforcement.** *See Griffin, supra* ("display of a weapon by an officer" during interrogation means reasonable person would believe they are not free to leave); *compare to United States v. Howard*, 115 F.3d 1151, 1153 (4th Cir. 1997 defendant not in custody where officers did not "brandish their weapons").

Every agent who entered Mr. Pence's home prior to the interrogation commencing was armed and held their weapon per F.B.I. policy at the low ready position – meaning guns were drawn and ready to be brough to bear quickly if needed. Nothing about this situation would be interpreted by a reasonable person as one Mr. Pence could voluntarily end.

5. **The isolation of the defendant from family or friends.** *United States v. Craighead*, 539 F3d 1073, 1087 (9th Cir 2008) (*Miranda* requires that if the F.B.I. isolates the suspect, and the suspect does not reasonably believe he is free to leave, warnings must be given); *United states v. Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007) (finding that defendant was in custody when "Officers purposefully separated [the defendant]. from her boyfriend and children and removed her to a back room."); *United States v. Beraun-Panez*, 812 F.2d 578, 582 (defendant in custody when "the interrogation of [the defendant]. took place well away from the public view, in a remote area where no passersby would likely be present").

Mr. Pence was separated from his family almost immediately upon the agents gaining access to the house. As the agents corralled his children, parents, and wife into the family room of the home he was kept in the front hallway of the house. After the initial separation, Mr. Pence was brought to the vehicle that Agent DeCarr had planned to use to interrogate Mr. Pence as part of the operational plan. While Agent DeCarr claimed he gave Mr. Pence choices as to where to be interrogated, Mr. Pence testified clearly that he had no recollection of being given a choice. Further, the mere option to pick where the interrogation happens does not in any way suggest the questioning is optional.

Agent DeCarr's acknowledged hat he planned to interrogate Mr. Pence in the Tahoe. Logically, that would only occur in an isolating fashion – Mr., Pence's entire family was clearly not invited to join him in the Tahoe. The plan to isolate person subject to interrogation is a commonly used tactic and one that was applied here across the board – in addition to Mr. Pence,

8

Ms. Pence was also separated from the rest of her family and questioned for hours. Clearly the agents went to the house with a defined to isolate and interrogate the Pence's.

6. **The level of police domination during the questioning.** *Mittel-Carey*, *supra* at 40 (stating that the key factor in that case was "the level of physical control that the agents exercised over the defendant during the search and interrogation" when officers ordered the defendant "to dress, go downstairs, and was told where to sit; he was physically separated from his girlfriend and not allowed to speak to her alone; and he was escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom.").

Here the defendant's home was raided pre-dawn by more than a dozen armed F.B.I. agents. He was escorted by armed agents as he moved through his house then, separated from his family physically and not given the opportunity to speak to his wife alone. The level of physical control exercised by the agents was massive.

7. **The nature of the questioning.** *Lee*, *supra* at 468 (defendant was in custody because F.B.I. agents questioned him in a patrol car for over an hour, confronted defendant with evidence of guilt, and told him that "it was time to tell the truth").

The facts of *Lee* and the facts here are nearly identical, and if anything, here suppression is more warranted than it was eve in *Lee*. Mr. Pence was held for two hours before being confronted with the evidence of his guilt and asked to confess (twice as long as in *Lee*). *Lee* did not have more than ten children, and his wife and parents all subject to armed F.B.I. agents in his home while he was interrogated. Mr. Pence had that exact situation. Agent DeCarr testified that he employed specific interrogation tactics, including rapport building for nearly two hours with the defendant before confronting him with the reality of the investigation. It's clear from the recorded interview, the search warrant application Agent DeCarr executed, and his testimony, that when he went to Utah he did so with the intention to draw a confession out of Chris Pence. Agent DeCarr did just that, while disregarding the rule of *Miranda* in the process. Mr. Pence's statements were not volunteered unprompted, they were the result of a lengthy and detailed plan to invade Mr. Pence's

home, separate him from his family, and hold him in a police vehicle then interrogate him and cause admissions.

Under the totality of the circumstances here, there is simply no possible reasonable conclusion to draw, other than Mr. Pence was in custody and should have been *Mirandized* by the time he was in the Chevy Tahoe on October 27, 2021.

## POINT II

**Mr. Pence was subjected to an illegal, deliberate two-step interrogation technique undermining the defendant's *Miranda* rights and requiring suppression of the entirety of the defendant's statement.**

*Missouri v. Seibert*, 542 U.S. 600, 609 (2004) established factors for the court to consider in determining the legality of a downstream *Miranda* warning. Those factors include:

1. **The completeness and detail of the questions and answers in the first round of interrogation;**

Here Mr. Pence's critical admissions came before he was *Mirandized*.

2. **The overlapping content of the two statements;**

After Mr. Pence made the inculpatory statement and was then *Mirandized*, his pre-*Miranda* statement was rehashed and confirmed. Virtually no new information was gleaned from the post *Miranda* statement.

3. **The timing and setting of the first and second interrogation;**

There was literally no change in time or setting from the pre-*Miranda* and post *Miranda* periods of interrogation.

4. **The continuity of police personal**;

Agent DeCarr and Agent Andersen conducted nearly 100% of both interrogations, with limited help from other agents and no break in time or major pause in that process.

### 5. The degree to which the interrogator's questions treated the second round as continuous with the first.

There was literally no break in the continuity of the first and second round of questioning. It flowed as one complete five-hour block of questioning. Notably, Mr. Pence was not warned that his pre-*Miranda* statement was inadmissible. *See United States v. Cohen*, 372 F. Supp. 2d 340, 355 (E.D.N.Y. 2005). The use of a "question-first" interrogation technique whereby law enforcement subjects a suspect to unwarned custodial interrogation until securing a confession and then, after administering *Miranda* warnings, again seeks to elicit the same incriminating statements, violates the suspect's Fifth Amendment rights because "the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning." *Seibert supra* at 604, 611.

### CONCLUSION

No reasonable neutral person could be placed in Mr. Pence's shoes and believe they are free to end the police interaction he was subjected to on October 27, 2021. The efforts by Agent DeCarr to paint Mr. Pence as agreeable and acting completely voluntarily ignore the reality that before dawn, Agent DeCarr and twenty other members of an F.B.I. team came to his house with guns drawn, helmets on, shields up, and breaching tools ready. They invaded Mr. Pence's home, separated him from his family, and removed him to their vehicle as planned. They questioned him with the intention too, and until he did, admit the criminal conduct he now stands charged of.

Just because Agent DeCarr paints Mr. Pence as polite and agreeable does not mean the situation was voluntary – any reasonable person would be polite and agreeable when F.B.I. agents are in their home with guns drawn. Being polite does not mean a situation is voluntary. In fact, nothing about Mr. Pence's interactions with Agent DeCarr and Andersen and the others would

seem voluntary to a reasonable person. The practical reality is Agent DeCarr traveled to Utah with a specific plan, and that plan was to place Mr. Pence in a police vehicle away from his family and make him admit the crimes he now stands charged of. This is straightforward custodial interrogation. Their plan was effective in large part, save for one error – Mr. Pence should have been *Mirandized* when he was placed in the Tahoe. That failure makes his confession inadmissible.

For the foregoing reasons, Mr. Pence respectfully requests that the Court grant an Order suppressing all statements made by Mr. Pence, the physical evidence based on those statements, and any other fruits of the illegal custodial interrogation, and granting such other and further relief as the Court deems proper.

Dated: July 20, 2023
Albany, New York

Schillinger & Associates, PLLC

By: _____
Eric K. Schillinger
Bar Roll No.: 516083
*Attorney for Defendant Christopher Pence*
11 North Pearl Street, Suite 1700
Albany, New York 12207
(518) 595-9529
eric@schillinger-law.com