# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

*****************************************

UNITED STATES OF AMERICA,

Case No.:      1:21-CR-393 (DNH)

v.

CHRISTOPHER PENCE,

Defendant.

*****************************************

## GOVERNMENT'S POST-HEARING BRIEF REGARDING
## DEFENDANT'S MOTION TO SUPRESS STATEMENTS AND EVIDENCE

Dated:    July 21, 2023

Respectfully submitted,

CARLA B. FREEDMAN
United States Attorney

By:      /s/ Emmet J. O'Hanlon
Emmet J. O'Hanlon
Assistant United States Attorney
Bar Roll No. 519779

I.      **PROCEDURAL POSTURE**

On December 20, 2020, the defendant, Christopher Pence, filed the instant Motion to Suppress Statements and Evidence (Dkt. 21) (hereinafter, the "Motion").   On January 24, 2023, the government filed its brief in opposition (hereinafter, the "Response") (Dkt. 27).   In its Response, the government conceded that there were facts in dispute, and joined in the defendant's request for an evidentiary hearing.   This Court held an evidentiary hearing on June 8, 2023, at which FBI Special Agents DeCarr, Andersen and Lydon testified for the government, and the defendant and his wife Michelle Pence testified on his behalf.   The hearing transcript was filed on the case docket on July 7, 2023. (Dkt. 43.)

II.      **INTRODUCTION**

This post-hearing brief will serve to: (1) highlight the salient evidence elicited at the hearing; and (2) place that evidence within the context of the controlling Supreme Court and Second Circuit caselaw previously cited in the government's Response, focusing on two recent decisions *Schaffer* and *Faux*.

Following the hearing, the Court may confidently rely upon the testimony of the government witnesses who swore out affidavits in support of the government's Response, testified consistent with those affidavits while being subject to cross-examination at the hearing, and who were not impeached by the defense.   Importantly, this evidence established that the that the defendant: (1) never had a firearm pointed at him; (2) was never placed in handcuffs; (3) was asked whether he would agree to speak with the agents either inside the residence or outside in a vehicle; (4) voluntarily agreed to speak with SAs DeCarr and Andersen in an FBI vehicle in his driveway; (5) entered the vehicle on his own accord; (6) was advised, at the outset of the interview, that he was not under arrest and that he was not required to speak with the investigators; (7) was

1

interviewed for less than two hours before he confessed to his role in the murder-for-hire scheme, which then led to his formal arrest and subsequent *Miranda* advisement; (8) was never yelled at or threatened by investigators; and (9) never asked to leave the vehicle once the interview started.

Moreover, the Court can find that the defendant's affidavit filed in support of the Motion is, in fact, replete with false assertions that the defendant, on cross-examination, attempted to justify as either the result of "his perception" of what happened or by passing them off as semantic differences, including that agents "stormed" his residence in "full riot gear," that he was "placed in a vehicle," and that he was "not told that [he] did not have to talk to [the agents]," all of which appears to be a calculated attempt to support his belated claim that his voluntary, non-custodial interview was actually – despite the objective factors to the contrary – custodial.

Furthermore, the Court should give little weight to the testimony of Michelle Pence, given that she acknowledged that she did not go downstairs before the defendant had already left the residence to speak with the agents. Accordingly, her perceptions of the execution of the search warrant cannot be attributed to the defendant for the purpose of determining how a reasonable person in his place would have experienced the search warrant execution and interview.

## III.   SALIENT EVIDENCE ELICITED AT THE HEARING

### A.   No Meaningful Impeachment of Government Witness Testimony

At the hearing, all three of the government witnesses testified consistently with their affidavits – without any meaningful impeachment – such that nothing had to be retracted or qualified. That testimony firmly established that:

    (1)    The defendant never had a firearm pointed at him (Transcript "Tr." 12:2-4; 71:9-11; 101:15-17);

    (2)    The defendant was never placed in handcuffs (Tr. 20:16-17; 72:9-10);

(3)     The agents asked – did not tell – the defendant to speak with them either inside the residence or outside in the vehicle, and he agreed to speak with them in their vehicle (Tr. 18:17-25; 73:21-74:11).

    (a)     The defendant was allowed to go upstairs to get his own shoes, before exiting the house (Tr. 19:8-2012; 74:14-23), which is inconsistent with someone who is under formal arrest.

(5)     The defendant entered the vehicle on his own accord (Tr. 20:4-15; 75:25-76:16);

(6)     The defendant was advised, at the outset of the interview, that he was not under arrest, and that he was not required to speak with the agents (Tr. 22:7-14);

(7)     The defendant was interviewed for less than two hours before he made confessions that led to his formal arrest and subsequent *Miranda* advisement (Tr.23:2-21);

    (a)     In fact, he was only confronted with the evidence against him for about six minutes before he began to confess his involvement in the murder-for-hire scheme (*Id.*);

(8)     The agents never yelled or threatened the defendant (Tr. 63:21-25; 72:2-4; 101:18-20); and

(9)     The defendant never asked to leave the vehicle once the interview started. (Tr. 64:1-2).

The above unchallenged facts are highlighted here – as they were in the government's Response – because they are among the foremost <u>objective</u> factors that courts have considered in determining "whether a reasonable person would have understood his or her freedom of action to

have been <u>curtailed to a degree associated with formal arrest</u>." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (emphasis added).   Objective, because caselaw instructs that an individual's subjective belief (in other words, his perception) does <u>not</u> bear on the custody analysis. *Stansbury v. California*, 511 U.S. 318, 323 (1994); *accord United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016).

**B.      The Defendant's Admissions Under Cross-Examination Provide Further Support for the Objective Factors Cited Above**

During the defendant's cross-examination, the defendant made admissions confirming the following:

(1)      That he was affirmatively told by agents that he was <u>not</u> was under arrest (Tr. 146:4-8; 154:4-6);

(2)      That he was never handcuffed (Tr. 146:2-3, "I was never physically handcuffed");

(3)      That he was not "put" into the vehicle by investigators, despite swearing in his affidavit that he was "placed" in the vehicle (Tr.146:9-148:4); and

(4)      That he was never yelled at by agents during the interview (154:23-24).

Also, with respect to the objective factors, it should be noted that the defendant has never claimed, in either his affidavit or in his testimony, that he was told he could not leave, or that a weapon was ever pointed at him during the execution of the search warrant or during the interview.

**C.      The Defendant's False Claims in His Affidavit, and His Refusal to Acknowledge the Errors Under Cross-Examination, Call His Overall Credibility into Question**

The defendant is a 42 year-old college graduate, currently employed as a Systems Engineer at Microsoft, with 25 years' experience in the tech industry. (Tr. 141:4-18.)   There has been no

evidence in this case that the defendant has difficulty reading or writing.  In fact, he acknowledged that he understood the meaning of signing his affidavit in support of the Motion under penalty of perjury and that he was swearing it to be the truth when he signed it. (Tr. 141:21-142:11.)  Yet the affidavit contained several false assertions – that agents "stormed" his residence in "full riot gear," that he was "placed in a vehicle," and that he was "not told that [he] did not have to talk to [the agents]" – which the government noted in its Response were demonstrably false.  The one thing that ties those falsehoods together, however, is the defendant's apparent goal to obfuscate and recharacterize the above-cited objective factors, which do not play in his favor otherwise.

For example, when he was directed to his claim in paragraph 15 of his affidavit that "I was not told that I did not have to talk to [Agent DeCarr]," and then confronted with the transcription of the interview in which SA DeCarr tells him "You're under no obligation to talk to us" (Dkt. 21-6, p. 3), the defendant admitted he that did, in fact, remember SA DeCarr telling him that, but that it was not misleading to claim belatedly that he "was not told he did not have to talk" to the agents because of the semantic difference between the phrases "no obligation to" and "did not have to." (Tr. 142:16-144:10).  When pressed, the defendant would not concede that his statement in his affidavit was either wrong or misleading. *Id*.  But to someone not in possession of the transcript of the interview – or who did not read all 271 pages carefully – the defendant's statement would clearly create the misimpression he was never advised that he was not required to speak with the agents, which is a critical question of fact in this case.  Given that the defendant doubled down on what he swore in the affidavit, it seems clear that this was an intentional attempt to confuse the factual record.

Another example of the defendant's blatant attempts at changing the factual record was his claim in his affidavit (para. 12) that he was "taken to one of the FBI Tahoes and placed in the rear

seat." At the hearing, the defendant acknowledged that he was never handcuffed, that he walked to the vehicle himself, opened the door and got inside on his own. (Tr. 145:20-147:2.) Yet, he was unwilling to concede that his statement did not accurately describe what actually happened, or that his statement appeared to be designed to convey the false notion that he was physically "placed" in the vehicle. (Tr. 147:3-148:1.) Of course, changing the narrative from one where he voluntarily leaves his family behind in his house to talk with the FBI agents in their vehicle, to one where he is forced into the car, would help him with another one of the objective factors demonstrating the non-custodial nature of his interview, but he was eventually forced to concede that he was not, in fact, "put" in the vehicle physically by anyone. (Tr. 147:21-148:1.)

Finally, the defendant's repeated claims in his affidavit that agents in "riot gear" "stormed" his house, and continued to "storm" it hours later while he was being interviewed in the FBI vehicle, are not supported by the factual record, including his own exhibits from the hearing. Specifically, defense exhibit "I" (depicted below) shows what the agents were actually wearing within approximately 6 minutes of entering the residence (*i.e.*, winter gear and bullet-proof vests).



Defense Exhibit "I."

For the defendant, at his age and with his level of education, to claim that "his definition" of "riot gear" encompasses the body armor that the agents actually wore (Tr. 152:5-8), and that he used the "storming" language because that is what the search "felt" like to him (Tr. 150:7-23.) – especially when combined with his above-referenced intentional mischaracterizations of key facts – calls into the question his credibility on every aspect of his testimony at the hearing.

Accordingly, given the above mischaracterizations and exaggerations by the defendant, the government submits that in the few areas where the defendant's testimony conflicts directly with the testimony of one of the FBI agents – for example where the defendant claims an agent threatened to shoot him if he walked too fast up the stairs while getting his shoes (Tr. 134:9-13), contrasted with SA Andersen's recollection that no one threatened to shoot the defendant, rather someone told the defendant to "slow down" (Tr. 75:4-19) – the Court should not credit the defendant's version.

### D.    The Testimony of Michelle Pence Carried Little Probative Value

As noted above, the defendant's wife Michelle Pence acknowledged that she did not go downstairs before the defendant had already left the house to speak with investigators. (Tr. 121:22-24.)  As a result, her perceptions of the execution of the search warrant cannot be attributed to the defendant for the purpose of determining how a reasonable person in his shoes would have experienced the same event, and thus do not factor into the analysis.

## IV.   RECENT SECOND CIRCUIT DECISIONS EVALUATING THE TOTALITY OF THE CIRCUMSTANCES WHERE SUSPECTS WERE INTERVIEWED DURING THE EXECUTION OF SEARCH WARRANTS (*SCHAFFER* AND *FAUX*) STRONGLY SUGGEST THAT SUPPRESSION IS NOT WARRANTED

Two relatively recent decisions by the Second Circuit evaluating district court rulings regarding whether defendants who were interviewed in the course of the execution of search warrants were actually in "custody" for the purposes of *Miranda* demonstrate that, by comparison, the totality of circumstances in the instant case also does not support a finding that the defendant was in "custody" when he was interviewed by the agents.

### A.    *United States v. Schaffer*, 851 F.3d 166 (2d. Cir. 2017)

In *Schaffer*, the Second Circuit affirmed the district court's holding that the defendant was not in "custody," after considering the following facts: (1) Schaffer was not handcuffed or otherwise physically restrained during his interview; (2) at no point did any of the agents have their weapons drawn; (3) the agents interviewed Schaffer in the familiar surroundings of his office building; (4) the agents informed Schaffer that he was not under arrest; (5) Schaffer voluntarily agreed to speak with the agents; (6) the interview lasted about an hour; and, (7) there was no evidence that Schaffer asked for an attorney or that the agents denied a request for an attorney. *Schaffer*, 851 F.3d at 174.  The district court had concluded that each of those facts cut against

8

holding that Schaffer was in custody.  The district court in *Schaffer* also considered the fact that the principal case agent denied Schaffer's two requests to leave the office where he was being interviewed, understanding that fact to suggest that Schaffer's freedom of movement was indeed curtailed, but it declined to treat that fact as decisive because it reflected only a limited restriction on Schaffer's freedom of movement – a determination with which the Second Circuit agreed. *Id.* at 175.

Moreover, while there were nine agents inside Schaffer's office during the search, only two of the agents conducted the interview, which took place in a separate part of the office away from the other seven agents.  The Second Circuit panel further noted that, "the number of officers is typically not dispositive" of custody, and "a reasonable person would not have felt 'completely at the mercy of [the] police' simply because he knew seven other agents were searching his office." *Id*.

The defendant in this case was similarly situated to Schaffer, with the main differences being that in this case the defendant was interviewed in a vehicle in his driveway, as opposed to a room in his work office, the interview lasted closer to an hour-and-a-half before the defendant confessed, instead of an hour, and the agents in this case had their weapons very briefly drawn upon (although never pointed at the defendant).  However, the agents in this case, unlike the agents in *Schaffer,* did not place even a limited restriction on his freedom of movement, which is arguably the most basic indication to an individual that the restraint on their freedom is equal to the degree associated with formal arrest.[1]  Nevertheless, even with Schaffer having been prevented from leaving his office – in effect being placed in custody by the interviewing officers – the Second

---

[1] *See California v. Beheler*, 463 U.S. 1121, 1125 (1983).

Circuit found it "clear that Schaffer's interview did not constitute a coercive environment tantamount to a formal arrest." *Id.*

B. *United States v. Faux,* **828 F.3d 130 (2d Cir. 2016)**

In *Faux*, the Second Circuit vacated the ruling of a district court that held that where the defendant was: (1) prevented from leaving her house during the execution of a search warrant; (2) separated from her husband and questioned for two hours in a different room of the house; (3) prevented from moving around her house; and (4) never told that she was free to leave or to stop responding to questions, that she was in "custody" and should have been *Mirandized* by law enforcement. The Second Circuit reversed the district court's decision finding that it had placed too much weight on the above "aggravating factors," and held that, as a matter of law, the defendant was not in "custody" because the interview took place in a familiar setting (the home), the defendant was never handcuffed, and the agents did not display firearms, use physical force or threaten the defendant. *Id.* at 138.

None of the "aggravating factors" identified by the Second Circuit in *Faux* are present in the instant case. Not only did the agents advise the defendant he did not have to speak with them, the defendant in this case was not forcibly separated from anyone. Rather, he voluntarily separated himself so he could discuss the case in privacy with the agents outside in their vehicle.

With respect to the factors which the Second Circuit identified as so salient that they overcame the "aggravating factors," except for the fact that one of the interview took place in a vehicle in the defendant's driveway, and the fact that the defendant may have viewed a brief display of firearms as agents secured the residence, he was treated the same as the defendant in *Faux* (e.g. no handcuffs, no force or threats).

10

### C.      Application to the Instant Case

Here, approximately fourteen agents were involved in executing the warrant of the residence, similar to *Faux*. The defendant was interviewed by only two officers immediately outside the home, and was told before beginning the interview that he was not under arrest, and that he was not required to answer their questions.  The length of the *unMirandized* portion of the defendant's interview was approximately one-and-a-half hours, was also similar to *Faux*.  As noted above, the Second Circuit in *Faux* held that where a defendant was never told that she was not free to leave, and never sought to end the interview, the defendant was not in custody. *See Faux*, 828 F.3d at 132.  Here, the defendant was told at the outset of the conversation that he was not under arrest, that he did not have to answer any questions, and was never told he wasn't free to leave.

Considering all of the circumstances of this case in light of controlling Second Circuit precedent and its recent application, no reasonable person would have thought their freedom of action to have been curtailed to a degree associated with formal arrest under the facts in this case. By the time the defendant was interviewed, all weapons had been holstered, there were no raised voices, he was not handcuffed, and he readily agreed to speak with agents of his own volition. Moreover, the evidence demonstrates that after the agents had completed securing the residence, further interaction with Defendant was preceded by clear communication that he was not under arrest and could refuse to talk to them.  Accordingly, it cannot be maintained that the defendant was in custody when interviewed in the vehicle outside his residence, and his statements should not be suppressed.

## IV.   CONCLUSION

For the reasons set forth above and as set forth in the government's previously filed Response, the Court should deny the defendant's Motion.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

*******************************************

UNITED STATES OF AMERICA,

                                        Case No.:        1:21-CR-393 (DNH)

    v.

CHRISTOPHER PENCE,

                        Defendant.

*******************************************

**CERTIFICATE OF SERVICE**

    I hereby certify that on July 21, 2023 the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the counsel of record for the defendant.


        */s/ Emmet J. O'Hanlon*
        Emmet J. O'Hanlon
        Assistant U.S. Attorney