UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE UNITED STATES OF AMERICA,

    -v-                     1:21-CR-393

CHRISTOPHER PENCE,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                OF COUNSEL:

HON. CARLA B. FREEDMAN    EMMET J. O'HANLON, ESQ.
United States Attorney for       Ass't United States Attorney
   The Northern District of New York
445 Broadway, Room 218
Albany, New York 12207

SCHILLINGER & ASSOCIATES, PLLC  ERIC K. SCHILLINGER, ESQ.
*Attorneys for Defendant*
11 North Pearl Street, Suite 1700
Albany, New York 12207

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On November 9, 2021, a grand jury indicted defendant Christopher Pence

("Pence" or "defendant") on one count of using a facility of interstate

commerce in connection with murder-for-hire in violation of 18 U.S.C.

§ 1958(a).  Defendant has moved to suppress statements he made to FBI

Special Agents Brian DeCarr ("DeCarr") and Christopher Andersen ("Andersen") during an interview that occurred in an FBI vehicle while law enforcement executed a warrant to search his residence.  After reviewing the parties' briefing, the Court ordered an evidentiary hearing (the "Hearing"), which took place on June 8, 2023.  At the conclusion of the Hearing, the Court directed the parties to review the transcript and to submit proposed findings of fact and conclusions of law.  The parties have filed those submissions, which the Court now considers along with their briefing on the suppression motion.

## II. <u>BACKGROUND</u>

Two months prior to Pence's November 9, 2021 federal grand jury indictment, a confidential source provided FBI investigators with copies of communications on the message board of a Darknet website depicting a user of the website paying approximately $16,000 worth of Bitcoin in exchange for the killing of a married couple residing in Hoosick Falls, New York.  After linking the communications to defendant and his family—based on interviews with the intended victims and connecting the Bitcoin paid to the purported hitman to defendant's financial and Internet accounts— DeCarr obtained a search warrant for defendant's residence in Cedar City, Utah (the "Residence") to search for further evidence of the murder-for-hire scheme.

On October 27, 2021, a team of law enforcement agents executed a federal search warrant on the Residence.  The Residence, located on a 20-acre property in the desert of southwest Utah, is a three-story, single family, 7-bedroom, approximately 5,800 square foot house accessed by a gravel driveway.

At approximately 6:48 a.m., with the temperature around 30 degrees Fahrenheit, DeCarr approached the door to the residence and knocked. Pence answered the door.  DeCarr introduced himself and notified the defendant that he had a search warrant for the Residence.  Defendant then allowed the investigators—consisting of approximately 14 law enforcement agents—into the Residence.

As the team entered the Residence, the law enforcement agents held their weapons in the "low-ready" position, pursuant to their training and based on information that Pence possessed weapons.  After entering the Residence, the agents spread out through the large house to ensure there were no safety hazards to the agents and no destruction of evidence taking place.  Agents escorted defendant's family, including his wife, parents, and children, from their various locations around the Residence to the first floor living room.  At no point did agents point firearms at defendant or members of his

family.  Once agents cleared the Residence, each of them holstered their handguns or shouldered and/or stowed their rifles in their vehicles.  The agents then set about their assigned tasks, which included interviewing the residents, seizing evidence and previewing electronic devices, as authorized by the warrant, and photographing the Residence.

While agents were securing the Residence, Pence remained with Andersen in the foyer of the Residence.  At one point, defendant went halfway up the main stairs, indicating that he would bring some more children downstairs, but agents stopped him and asked him to call for them to come downstairs instead.

As agents finished securing the Residence, DeCarr asked Pence if he was willing to speak with the agents either in the Residence or in their vehicle outside.  Defendant suggested speaking with the agents in their vehicle. Without attempting to speak with his family, defendant indicated that he needed to retrieve his shoes from his upstairs bedroom, and he went up the stairs quickly with Andersen in tow.

After retrieving his shoes, Pence put on a jacket, exited the Residence, approached the vehicle—a Chevrolet Tahoe seven-seat SUV (the "Tahoe")— on his own, opened a passenger door, and got in.  Other than DeCarr and Andersen, no other agents were near the vehicle at this time.

4

At no point did agents prevent the residents from looking out the windows of the Residence, or from moving about the Residence once agents completed their search.  At no point was Pence, or any other resident, ever placed in handcuffs.  Rather, while defendant was in the Tahoe, his wife, parents, and children went about their day inside the Residence.

At approximately 7:06am, as DeCarr and Andersen were settling into the Tahoe, DeCarr advised Pence that:

> You are not under arrest, at all.  That's not what we're doing.  We're just- we're here to talk.  You're under no obligation to talk to us, we- we would appreciate your help, okay?  In- in just trying to figure out - 'cause obviously we're here for a reason, right?

DeCarr and Andersen's interview of Pence began with a discussion of defendant and his family's background, their relationship to the intended victims (whose biological children defendant's family had legally adopted), defendant's job as a security architect for Microsoft, and the passcodes for his electronic devices.  At no point did defendant ask the agents what they were searching for in his residence or whether he was under arrest.

After approximately an hour-and-a-half, DeCarr began to inform Pence about the evidence that the FBI had developed in the case.  Defendant confirmed the accuracy, in turn, of all the evidence.  Approximately fifteen minutes later, and for approximately the next half-hour, defendant explained why he attempted to order the killing of the intended victims, apologized for

initially lying to investigators, and proceeded to respond in detail to the agents' questions regarding how he accessed the Darknet site to arrange the murder-for-hire.

Following this discussion, approximately two hours and ten minutes into the interview, DeCarr informed Pence that he would be taken before a judge and proceeded to advise defendant of his *Miranda* rights.  Specifically, DeCarr advised defendant (and defendant responded) as follows:

> **DeCarr**:  Before we ask you any more questions, you must understand your rights, alright? You have the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer for advisement before we ask you any more questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any question if you wish. If you decide to answer questions now, without a lawyer present, you have the right to stop answering at any time. So, all I'm looking for now, is that you understand your rights. That's what I'm looking for, okay? So this consent here says, I have read the statement of my rights, and I understand what my rights are. At this time I am willing to answer questions- in this case, any more questions- without a lawyer present. Is that something you're willing to talk to about further?

> **Pence**:  Yeah.

Pence then signed a form acknowledging his rights and consenting to continue speaking to the agents without a lawyer present.  For the remainder of the interview, defendant provided some additional details about the technical aspects of the murder-for-hire scheme and verified the accuracy of the communications that the FBI originally received from the confidential source.  However, much of the remaining two-and-a-half hours of recorded

interview consisted of "small talk" with the agents about topics other than the investigation while other agents finished searching the Residence.  Prior to transporting defendant to jail, law enforcement offered defendant the opportunity to speak to his wife, but he declined.

## III. <u>FINDINGS OF FACT</u>[1]

In his post-Hearing submission, Pence highlights the following pieces of testimony:

i.    Before dawn on October 27, 2021, fourteen men armed with rifles, pistols, a bulletproof shield, sledgehammers, and breaching tools lined up at the front door of Pence's home in Utah.  Dkt. No. 43 ("Tr.") 9:13–24; 35:12–23; 36:1–10; 130:16–18.

ii.    The fourteen men who arrived at Pence's house wore bulletproof vests, some wore helmets, and all of them, per FBI policy, held their guns in the "low-ready" position.  Tr. 93:15–94:16.[2]

iii.    This group of fourteen men were part of a group of twenty-one total agents and civilian employees of the FBI and local law enforcement who arrived at the Residence on October 27, 2021.  Tr. 32:17–33:4.

iv.    DeCarr, who was the case agent assigned to the murder-for-hire investigation in New York, Tr. 4:15–19, initiated the law enforcement contact with Pence on October 27, 2021.  Tr. 60:15–24.

---

[1] Based on the evidence the parties presented at the Hearing, and having considered the testimony of the parties' witnesses, the following facts were established by a preponderance of the credible evidence.  To the extent any finding of fact may include a conclusion of law it is deemed to be a conclusion of law, and vice versa.

[2] Defendant further states that "low ready" is a law enforcement term meaning that the men held their guns in their hands and were prepared to fire them at a "moment's notice," but DeCarr's testimony was specifically that "[l]ow ready is when you have your weapon in your hand but it's not pointed at anybody. It's pointed typically towards the ground [at] about [a] 30- to 45- degree angle." *Id*. 11:21–25; 12:1.

v.      Upon initially meeting Pence at his door the morning of October 27, 2021, DeCarr did not have probable cause to arrest him.  Tr. 23:22–24:1.

vi.     DeCarr knocked on Pence's door at 6:48 a.m.  Tr. 9:3.  When defendant opened it, he claims "it felt like Armageddon had come to [his] front door and [he] was the only one standing in the way." *Id*. 130:12–14.  Defendant noticed agents' sledgehammers and thought to himself "they are coming in whether I let them in or not." *Id*. 130:16–18.

vii.    The agents directed Pence to bring his family members downstairs from the second floor, Tr. 133:1–3, but when he started up the stairs to get them, agents stopped him and told him to call them downstairs verbally, *id*. 133:5–10.

viii.   While securing the Residence, agents kept Pence's family members in the living room.  Tr. 106:14–18.

ix.     After Pence called for his family to come downstairs in the Residence, one of the agents told him that they needed to speak with him about a sensitive topic, and that they should talk outside of the Residence.  Tr. 133:18–21.

x.      DeCarr had planned to use the Tahoe to speak with Pence. Tr. 19:17–22.

xi.     Pence was not wearing shoes, and an agent accompanied defendant to his bedroom to retrieve them.  Tr. 134:3–6.[3]

xii.    DeCarr had gone to the Tahoe while Pence was retrieving his shoes to start the audio recording equipment in anticipation of a discussion with Pence.  Tr. 19:13–16.

xiii.   Once outside and approaching the Tahoe, one of the agents said to Pence, "Why don't you get in on the other side."  Tr. 135:23–24. Pence walked around the front of the vehicle, opened the door, got in, and closed it.  *Id*. 135:24–136:1.

---

[3] Defendant also claims that an agent threatened to shoot him if he walked too quickly up the stairs while retrieving his shoes, Tr. 134:9–13, but, as noted *infra*, Andersen recalled that agents merely told defendant to "slow down," *id*. 75:4–19.

xiv.   DeCarr told Pence "you have no obligation to speak with us" when he began questioning him in the Tahoe.  Tr. 22:12.

xv.   DeCarr acknowledged that, at the time he approached Pence's door in the morning, he did not have probable cause.  Tr. 23:25–24:1.

And as the Government notes, at the Hearing, its three witnesses testified consistently with their affidavits.  This testimony, in relevant part, contained the following:

i.   Agents never pointed a firearm at Pence.  Tr. 12:2–4; 71:9–11; 101:15–17.

ii.   Agents never placed Pence in handcuffs.  Tr. 20:16–17; 72:9–10.

iii.   Agents asked (rather than demanded) Pence to speak with them either inside the Residence or outside in the vehicle, and he agreed to speak with them inside the vehicle.  Tr. 18:17–25; 73:21–74:11.

iv.   Agents allowed Pence to go upstairs to retrieve his shoes before exiting the house.  Tr. 19:8–12; 74:14–23.

v.   Pence entered the Tahoe for an interview with DeCarr and Anderson on his own accord.  Tr. 20:4–15; 75:25–76:16.

vi.   DeCarr advised Pence at the outset of the interview that he was not under arrest and that he was not required to speak with law enforcement.  Tr. 22:7–14.

vii.   DeCarr and Anderson interviewed Pence for less than two hours before he made confessions leading to his formal arrest and his subsequent *Miranda* warning. Tr. 23:2–21.  The agents only confronted defendant with the evidence against him for approximately six minutes before he began to confess his involvement in the scheme.  *Id*.

viii.   The agents never yelled at or threatened Pence.  Tr. 63:21–25; 72:2–4; 101:18–20.

9

ix. Pence never asked to leave the Tahoe once the interview started. Tr. 64:1–2.

Moreover, during the government's cross-examination of Pence, he made the following admissions:

i. Agents affirmatively told Pence that he was not under arrest. Tr. 146:4–8; 154:4–6.

ii. Pence was never physically handcuffed.  Tr. 146:2–3.

iii. Agents did not "place" or "put" Pence into the Tahoe; rather, he opened the door himself and closed it once inside the vehicle.  Tr. 146:9–148:4.

iv. DeCarr and Anderson did not yell at Pence while he was in the Tahoe.  Tr. 154:23–24.

## IV. <u>CONCLUSIONS OF LAW</u>

On a motion to suppress evidence in a criminal trial, once the defendant has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers.  *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (quoting *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004)); *see also United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence").

Pence first argues that the Government violated his *Miranda* rights, and that all statements he made to law enforcement should be suppressed as a

result.  Specifically, defendant claims he was in custody when armed agents escorted him out of the Residence and directed him to the Tahoe for a planned interrogation, but that the agents did not provide him with *Miranda* warnings until after he gave a complete confession more than two hours after the interrogation began.  On the other hand, the Government claims that the totality of the circumstances in this case do not support a finding that defendant was in custody at the time he made his confession to DeCarr and Andersen.

In the context of custodial interrogations, the Supreme Court has created safeguards to protect the individual's Fifth Amendment right against self-incrimination, known as "*Miranda* rights."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  "[T]he Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior [*Miranda*] warning."  *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).  However, "'[v]olunteered statements of any kind are not barred by the Fifth Amendment' and, thus, do not require preliminary advice of rights."  *United States v. Rommy*, 506 F.3d 108, 132 (2d Cir. 2007).

To determine whether an individual is "in custody" for the purposes of *Miranda*, a court looks at the totality of the circumstances and asks "how a reasonable man in the suspect's position would have understood his situation."  *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (quoting

*Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).  Notably, an individual's subjective belief does not bear on the custody analysis, nor do the subjective views of the interrogating officers.  *Stansbury v. California*, 511 U.S. 318, 323 (1994).  Instead, a court considers various factors to determine whether an individual was in custody.  These factors include: (1) the interrogation's duration; (2) its location; (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.  *Faux*, 828 F.3d at 135.

Upon review of the relevant testimony, and considering the totality of the circumstances, the Government has established by a preponderance of the evidence that Pence was not in custody at the time he made his confession to DeCarr and Andersen.  Fourteen agents were involved in executing the warrant, but only two—DeCarr and Andersen—interviewed defendant.  And although the agents were armed, all weapons had been holstered by the time the interview with defendant began.  To be sure, this interview took place in an FBI vehicle, but the vehicle was just outside of the Residence in the driveway, agents never handcuffed defendant, and defendant testified that he let himself into the Tahoe and closed its door behind him.  Notably, DeCarr and Andersen also informed defendant before beginning the interview that he

was not under arrest and was not required to answer their questions, and they never told him that he was prohibited from leaving the interview.

While the agents did interview defendant for somewhere between an hour-and-a-half and two hours before providing a *Miranda* warning, this period is substantially similar to that in *Faux*, where the Second Circuit deemed statements given during an approximately two-hourlong un-*Mirandized* portion of an interview admissible. *See* 828 F.3d at 139. Indeed, *Faux* likely presented a closer question with respect to the custodial analysis than does this case. There, agents never told the defendant that she was free to leave; prevented her from leaving her house during the execution of a search warrant; separated the defendant from her husband and questioned her in a different room of the house; and prevented her from moving around her house. *Id*. at 136–138. Despite these "aggravating factors," the Second Circuit held that the defendant was not in custody because the interview took place in the defendant's home, the defendant was never handcuffed, and the agents did not display firearms, use physical force, or threaten the defendant. *Id*. at 138.

Pence's experiences also recall another somewhat recent Second Circuit case—*United States v. Schaffer*, 851 F.3d 166 (2d Cir. 2017). In *Schaffer*, the Second Circuit affirmed the trial court's determination that the defendant was not in custody after considering the following facts: (1) the defendant was

not handcuffed or otherwise physically restrained during his interview; (2) at no point did any of the agents have their weapons drawn; (3) the agents interviewed the defendant in his office building; (4) the agents informed the defendant that he was not under arrest; (5) the defendant voluntarily agreed to speak with the agents; (6) the interview lasted about an hour; and (7) there was no evidence that the defendant asked for an attorney or that the agents denied a request for an attorney.  851 F.3d at 174.

In sum, the circumstances of this case and the controlling Second Circuit precedent make clear that no reasonable person in Pence's position would have considered his freedom to have been curtailed to a degree associated with formal arrest.  Accordingly, defendant was not in custody when DeCarr and Andersen interviewed him in the Tahoe, and his statements made during that interview will not be suppressed.

Pence next argues that DeCarr and Andersen subjected him to an illegal and deliberate two-step interrogation technique, which undermined his *Miranda* rights and mandates suppression of his entire statement to the agents.

The Supreme Court has twice considered whether a post-*Miranda* warning inculpatory statement must be suppressed if law enforcement previously interrogated the defendant without a warning.  *See Oregon v. Elstad*, 470 U.S. 298 (1985); *Missouri v. Seibert*, 542 U.S. 600 (2004).

Somewhat more recently, the Second Circuit has considered this precedent and articulated a straightforward analysis. *See United States v. Moore*, 670 F.3d 222, 229–230 (2d Cir. 2012). First, a court must ask if "the initial statement, though voluntary, [was] obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further." *Id.* at 229. If so, the court must then ask, "has the government demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did *not* engage in a deliberate two-step process calculated to undermine the defendant's *Miranda* rights?" *Id.* at 229–230. If the answer is yes, "the defendant's post-warning statement is admissible so long as it, too, was voluntary." *Id.* at 230. If the answer is no, "the post-warning statement must be suppressed unless curative measures … were taken before the defendant's post-warning statement." *Id.*

In this case, the Court's analysis with respect to the *Moore* framework is short. As noted *supra*, DeCarr and Andersen's initial interview of Pence in the Tahoe did not violate his *Miranda* rights because he was not in custody, and thus there was no two-step interrogation. Accordingly, defendant's rationale for suppressing the entirety of his statements to the agents will be rejected.

## V. **CONCLUSION**

Therefore, it is

ORDERED that

1. Defendant's motion to suppress is DENIED.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  October 18, 2023
         Utica, New York.