**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA

        v.

CHRISTOPHER PENCE,

        Defendant.

Case No.  1:23-CR-393 (DNH)

**GOVERNMENT'S SENTENCING
MEMORANDUM**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, hereby files its sentencing memorandum requesting that the Court impose a sentence of imprisonment at the high end of the applicable advisory U.S. Sentencing Guidelines' (the "Guidelines" or "U.S.S.G.") range (*i.e.*, 108 months) based on the dangerousness of the defendant's conduct, and the fact that the Guidelines do not adequately distinguish the defendant's conduct from that of similarly-charged defendants, given what the defendant sought to bring about through his actions (*i.e.*, the murder of two parents with eight young children and the collateral risks posed by ordering such a murder).

The government further seeks the maximum term of supervised release of three years with the special conditions recommended by Probation for the protection of the public and the defendant himself.

**I.**

**INTRODUCTION**

On December 6, 2023, pursuant to a conditional plea agreement, the defendant pled guilty to Count 1 of a single-count Indictment charging him with the Use of a Facility of Interstate

1

Commerce in Connection with Murder-For-Hire, in violation of 18 U.S.C. § 1958(a).  The defendant is scheduled to be sentenced on April 4, 2024, in Utica, New York.

## II.

## OFFENSE CONDUCT

Between July 16 and August 9, 2021, the defendant used a computer connected to the internet at his home in Cedar City, Utah, and The Onion Router (TOR) to access a website on the Darknet[1] dedicated to arranging contract killings.  Through the website, the defendant arranged for the murder of C.C. and F.C., both residents of Hoosick Falls, New York, in exchange for approximately $16,000 worth of Bitcoin.  The defendant chillingly described the victims – who he knew to the parents of eight young children – as "a couple targets husband wife that I am needing removed."

The defendant provided a website administrator with the address, names, and photographs of the intended victims. He also instructed the administrator to make the murder look like an accident or a botched robbery, and requested that care be taken not to harm any of the children in the care of the victims, stating "I am a couple days away from submitting the job as an accident, but before I do, I was wondering, in your experience, even if it is an obvious accident, what kind of investigation will be ran against me, knowing that we are not on the best of terms? … I have the $$ in CoinBase, but is there something I can do, to help obfuscate my role in this? … They most likely will have 3 children in the car with them… I am really trying to avoid them from being hurt… Im wondering if a mugging-gone-wrong might be an option."

---

[1] The Darknet, or the "dark web," is an encrypted portion of the Internet which is not visible through a traditional search engine, such as Google. In order to access the Darknet, a user must use a network specifically designed to access the dark web, such as The Onion Router, or "TOR."

Between July 26 and July 29, 2021, the defendant paid the website administrator approximately $16,000 in Bitcoin through four payments from a cryptocurrency wallet and exchange linked to the defendant.  Ultimately, no attempt was made on the lives of the intended victims.

On October 27, 2021, the Federal Bureau of Investigation executed a search warrant on the defendant's home in Cedar City, Utah. While the warrant was being executed, the defendant admitted to soliciting the murder of C.C. and F.C. through the Darknet website and to paying $16,000 in Bitcoin for the murders.  The defendant explained his solicitation of their murders by describing the fraught relationship between his family and the victims following the defendant's family's adoption of several of the victims' children and allegations of child abuse and/neglect on both sides.  And although he attempted to cancel his order with the website several days after he paid the Bitcoin, the defendant never received a refund from site, nor did he ever warn the victims that they might be in danger from the hitman he had hired to kill them.

The government otherwise adopts the facts as set forth in the Presentence Investigation Report ("PSIR") prepared by the United States Probation Office. *See* PSIR (Dkt. 55) ¶¶ 6-19.

### III.
### APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

1. **Statutory Sentencing Provisions**

    a.    **Maximum Term of Imprisonment:** 10 years, pursuant to 18 U.S.C. § 1958(a).

    b.    **Maximum Fine:** $250,000, pursuant to 18 U.S.C. § 3571(b)(3).

    c.    **Supervised Release Term:** In addition to imposing any other penalty, the sentencing court may require the defendant to serve a term of supervised release of up to 3 years, to begin after imprisonment. *See* 18 U.S.C. § 3583(b).  A violation of the conditions of supervised release during that time period may result in the

defendant being sentenced to an additional term of imprisonment of up to 2 years. *See* 18 U.S.C. § 3583(e).

    **d.**    **Special Assessment:** The defendant will pay an assessment of $100, pursuant to 18 U.S.C. § 3013.

**2.**    **Guidelines Provisions**

    **a.**    **Offense Level**: The government adopts the Guidelines calculations set forth in the PSIR, including the calculation of the base offense level as 32, pursuant to U.S.S.G. § 2E1.4(a)(1), and the 3 levels of downward adjustment for the defendant's early acceptance of responsibility, pursuant to U.S.S.G. §§ 2E1.1(a) and (b), for a total offense level of 29. *See* PSIR ¶¶ 23-33.

    **b.**    **Criminal History Category**: The government agrees with Probation's determination of the defendant's criminal history category as I. *See* PSIR ¶ 37.

    **c.**    **Guidelines Imprisonment Range**: As described above, the defendant's total offense level is 29, and his criminal history category is I.  As a result, the Guidelines advise that the defendant receive a sentence of 87 to 108 months in prison. *See* PSIR ¶ 59.

**3.**    **The Defendant is Not Eligible for a Two-Level Reduction in Offense Level as a "Zero-Point Offender" Because He Attempted to "Procure" Violence and His Conduct Presented a Credible Threat of Violence**

The defendant in his sentencing memorandum (Dkt. 56 pp. 7-19) claims that he should receive a two-level reduction to his offense level – pursuant to U.S.S.G. § 4C1.1 – because he has zero criminal history points and meets the other criteria for eligibility, specifically including the requirement that he not have "used violence or credible threats of violence in connection with the offense" (§ 4C1.1(a)(3)).   He is wrong for two reasons.   First, the defendant, in fact, "used"

4

violence by attempting to "procure" the violent murder of the victims, which is definitional relevant conduct under U.S.S.G. § 1B1.3(a)(1).   Second, his solicitation of their murder represented a "credible threat" of violence to the victims (§ 4C1.1(a)(3)), whether or not they were aware of the threat he posed to them.

For background, the new provisions set forth at U.S.S.G. § 4C1.1 provide for a two-level reduction for defendants who have zero criminal history points if the defendant meets the ten listed criteria (which include receiving zero criminal history points from Chapter 4, Part A).  The U.S. Sentencing Commission noted that these criteria identify circumstances in which zero-point defendants "are appropriately excluded from eligibility" for the reduction based on the seriousness of the offense or aggravating factors involved in the instant offense. U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines (April 27, 2023) at 79-80.  As the Commission noted, the criteria are "informed by existing legislation, including the congressionally established criteria for the statutory safety valve at 18 U.S.C. § 3553(f)…" *Id*. at 80.

As referenced above, § 4C1.1(a)(3) ("Violence or Credible Threats of Violence") provides that a defendant who used "violence or credible threats of violence in connection with the offense" is not eligible for the two-level reduction in offense level.   It should be noted that this language is different than the "crime of violence" definition in §4B1.2.  Instead, §4C1.1(a)(3) is taken from the first part of the statutory "safety valve" language in 18 U.S.C. § 3553(f)(2), and U.S.S.G. §5C1.2(a)(2), which implements the statute.  Accordingly, courts may rely on caselaw interpreting § 3553(f)(2) and § 5C1.2(a)(2) in determining the scope of § 4C1.1(a)(3).

Application Note 2 of § 5C1.2 specifies that the defendant's relevant conduct – as defined by U.S.S.G. 1B1.3 – should be considered in determining whether a defendant "used violence or credible threats of violence… in connection with the offense."   In turn, § 1B1.3(a)(1) defines

relevant conduct as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, **procured**, or willfully caused by the defendant." (emphasis added)

In this case, the defendant **procured** violence against the victims by arranging for their murder.  The defendant argues that because there was no actual violence committed therefore violence was not "used" by the defendant, but that is an incorrectly narrow interpretation of §4C1.1(a)(3) that does not comport with the definition of "relevant conduct" referenced in § 5C1.2 (App. Note 2) and § 1B1.3(a)(1), which the Court is bound to consider.  Besides, limiting the "use of violence" language to cover only completed acts of violence, as urged by the defendant, would lead to the bizarre result of all inchoate acts contemplating violence being excluded.  Under that theory, for example, a defendant who planted a bomb that did not explode or who shot at someone, but missed, would not have "used violence" as part of their offense conduct, which goes against logic and the definitional language of 1B1.3(a)(1).

Moreover, the limited caselaw interpreting § 5C1.2(a)(2) regarding what constitutes a "credible threat" supports the position of both the government and Probation that the defendant's solicitation of murder from a third party represented a "credible threat" (PSIR § 30), and that the defendant was excluded from 4C1.1 relief on those independent grounds.  Again, the defendant's overly narrow reading of the language of 4C1.1(a)(3) – that a "credible threat" must be personally conveyed to a victim – is unsupported in the context of § 5C1.2(a)(2).  For example, in *United States v. Resterhouse*, 685 F. App'x 436, 440 (6th Cir. 2017), a panel of the Sixth Circuit determined that where a defendant requested a co-conspirator kill a third party over the theft of drug proceeds, and provided instructions for how to carry out the killing, the threat was "credible" for the purposes of denying the defendant safety-valve relief pursuant to §5C1.2,  despite the killing never being carried out nor the threat ever being conveyed to the intended victim.

6

Similarly, in *United States v. Cyrus*, 238 F. App'x 929, 932 (4th Cir. 2007), a panel of the Fourth Circuit upheld a district court's denial of safety-valve relief to a defendant who was recorded threatening to kill other drug dealers (not on the call) if he discovered them using counterfeit money, where the district court had determined the threat to have been credible ("[C]ases and statutes interpreting the definition of the word 'threat' have uniformly held that communication to the intended victim is not necessary to support the crime or an enhancement based on the threat, unless communication is an essential element of the crime.")

The defendant's reliance on *Watts*, *Valerio* and *Fernandez* is misplaced because those cases analyzed threatening language as an essential element of the crime and outside the context of §5C1.2(a)(2).

## IV.
## GOVERNMENT'S SENTENCING RECOMMENDATION

### High End Guidelines Sentence Requested

Based on all of the information before it, the government respectfully requests that the Court impose a sentence at the high end of the applicable advisory Guidelines range (*i.e.*, 108 months), to be followed by a term of supervised release for the maximum-authorized three years.

Such a sentence would be sufficient, but not greater than necessary, to comply with the sentencing purposes in 18 U.S.C. § 3553(a). "[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).  Moreover, within-Guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act "to diminish unwarranted sentencing disparity." *Rita v. United States*, 551 U.S. 338, 354 (2007).

7

Of the "sentencing purposes" set forth in 18 U.S.C. § 3553(a), the government submits that the purpose most relevant to the instant case is set forth in in sub-section (2)(A) of the above code section, which explains *inter alia* that a sentence should "reflect the seriousness of the offense," and "provide just punishment."

Seriousness of the Offense

While the defendant has accepted responsibility by pleading guilty and acknowledging the offense conduct (PSIR ⁋ 22), the fact remains that the defendant's behavior in this case – soliciting the murder of two parents with eight young children (five of which were adopted by the defendant's family) and paying someone he believed to be a hitman approximately $16,000 to carry out the killing – shocks the conscience.

Although the defendant now appears to understand the gravity of the offense, it was not one committed in the heat of the moment.  Rather, the murder-for-hire scheme hatched by the defendant required extensive planning, and took over three weeks to accomplish, given that the defendant had to access the Darknet using a specialized browser, find a site providing hitman services, describe in detail how the killing should be accomplished, and transfer Bitcoin in four transactions over four days using a cryptocurrency wallet designed to obfuscate the source of the funds.  At any point during the period the defendant could have changed his mind, but he did not.

Furthermore, the defendant was aware that there could be collateral consequences to the killing of the victims, to the extent that they had three small children in their care who could be hurt in the process, but that concern did not dissuade him from paying for the killing, which he instructed should be made to appear like a robbery gone wrong.  In fact, the defendant told the would-be-hitman that having the victims' thirteen-year-old son witness the staged killing of his

parents could help him avoid detection if the child's description of the killing led the police to the false conclusion that it was a botched robbery. (PSIR p. 6.)

In short, the defendant meticulously planned the cold-blooded murder of two people with whom he admittedly had deep disagreements without regard for the collateral consequences, and used his background and expertise in technology to attempt to avoid detection.  It is difficult to comprehend a more serious offense that did not result in actual death and/or destruction.

Just Punishment for the Offense

Despite the seriousness of the offense, the Guidelines prescribe a base offense level of 32 – without any specific enhancements – for all cases where no one is ultimately harmed.   This base offense level applies regardless of aggravating factors that may have been present, such as the ones described above (*i.e.*, the degree of planning, the degree of technical expertise required, and the acknowledged collateral consequences of such a killing).

Moreover, the above base offense level applies regardless of how many victims are implicated in the murder-for-hire scheme.  The fact that there were two intended victims in this case does not alter the offense level.

Nor do the Guidelines account for the personal characteristics of the defendant, specifically that the defendant is a college-educated professional who used his knowledge and wealth to plan the cold-blooded murder of two people because they angered him.

Accordingly, a high-end sentence would acknowledge that the defendant's conduct included the above aggravating factors that set him apart from others charged with the same offense, and that the defendant merits a more serious punishment.

**V.**

**CONCLUSION**

For all of the reasons set forth above, the government maintains that a sentence of imprisonment at the high end of the applicable Guidelines range, and a three-year term of supervised release to follow, is warranted, just, and not greater than necessary to accomplish the goals of sentencing. 18 U.S.C. §3553(a).

Respectfully submitted March 14, 2024.

CARLA B. FREDDMAN
United States Attorney

By: _____

Emmet O'Hanlon
Assistant United States Attorney
Bar Roll No. 519779